# THE UNITED RAILWAYS & ELECTRIC CO. OF BALTIMORE,

## *vs.*

# THE STATE ROADS COMMISSION.

*Police power*: *limitations of—*. *State Roads Commission*: *improvement of highways; within limits of Baltimore City; rights of railway companies.*

Chapter 141 of the Acts of 1908 does not give the State Roads Commission the power to take, acquire or disturb any interest, easement or right of any individual or corporation, otherwise than by agreement, gift, purchase or condemnation; and the fact that the Act expressly states the manner in which all property, rights and interests necessary for the purpose of the Act may be acquired, negatives the idea that the Legislature intended to confer upon the Commission the power to disturb those rights under the authority of the police power of the State.                              p. 583

Whatever police power can be exercised by a municipal corporation over the rights and property of the citizen, must be derived from the Legislature of the State; it must be expressed by grant, or by fair and reasonable intendment; otherwise the trades and business of the people would be at the mercy of, and dependent upon, the caprice of those who might exercise municipal power, instead of being governed by the general law of the State.                              p. 586

Chapter 141 of the Acts of 1908 does not authorize the State Roads Commission to require a railway company to move its tracks, at its own cost.                    pp. 582, 584

The intention of the Legislature, as expressed by Chapter 141 of the Acts of 1908, was to provide for the entire cost of the construction and improvements of such roads and turnpikes,

as might be selected by the State Roads Commission, as part of the system of new roads and highways of the State, and nothing in the Act suggests that part of that expense was to be borne by the electric railways company whose rights the Act expressly declares shall not be disturbed. p. 589

Even if a city street may be improved by the State Roads Commission, yet turnpikes within the limits of Baltimore City, while in course of construction or improvement by the commission, belong to and are under the control of the State, and all contracts made by the commission for their construction or improvement must be construed with reference to the powers of the commission under the Act creating it. p. 587

Where a contract, under which the United Railways Company made certain changes in its tracks and the streets on which they were laid, was made with the State Roads Commission, and the work was done in compliance with the commission's requirements, it was *held*, that the liability of the parties to any contract for the cost of such work must be determined by the provisions of the Act of 1908, and that the commission could not escape the liability of such expense on the ground that the city could require the railways company to make its track conform to any change that the city might make in the grade of such street. p..587

*Decided June 25th, 1914.*

Appeal from the Superior Court of Baltimore City. (HEUISLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON and CONSTABLE, JJ.

*Joseph C. France* (with whom was *J. Stanislaus Cook,* on the brief), for the appellant.

*S. S. Field, the City Solicitor,* and *Isaac Lobe Straus* (with whom was *Leon E. Greenbaum,* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

In 1908 the Legislature passed an Act, Chapter 141, "providing for the establishment of a system of public roads and highways in Maryland, and providing for the appointment of a Commission to be known as the 'State Roads Commission,' with full powers to construct, improve and maintain public roads and highways in the several counties of this State; and providing also the ways and means, and making the necessary appropriations of money and for a bond issue for the construction, improvement and maintenance thereof, and for the expenses of such Commission in the execution of its powers and duties."

By Section 32B of the Act, the State Roads Commission, hereinafter referred to as the Commission, was given full power and charged with the duty to select, construct, improve and maintain such a general system of improved State roads and highways as could "reasonably be expected to be completed" with the funds therein provided "in and through all the counties of this State," and was required to make the selection of the roads to be improved before the first of May, 1909. The Commission was authorized to make such preliminary investigation, to do such preliminary work and to adopt such means or system of road construction, etc., as in it its judgment was best calculated to promote the objects of the Act; "condemn, lay out, open, establish, construct, extend, widen, straighten, grade and improve, in any manner, any main road, of the system, in any county of this State and establish or fix the width thereof; cause to be prepared such surveys, plans, drawings or maps as it may deem proper in the course of its work; acquire for the State of Maryland, by agreement, gift, grant, purchase or condemnation proceedings * * * any private road or roads whatsoever, or private property or rights of drainage for public use, whether belonging to private individuals or to turnpike companies or other corporations, and including any avenues, roads, lanes or thoroughfares, rights or interests, franchises, privileges or easements, that may be, in its judg-

ment, desirable or necessary to complete said system of roads or to carry out the purposes of this Act; contract with any person or persons, company or corporation, either private or quasi-public, or municipal, in furtherance of the duties and objects of this Act or any of the same," etc. · This section authorized and directed the Commission to include in its work of improving the system of main roads of the State the improvement of such portions of the main roads selected by said Commission as a part of such system "as lie inside the limits of the City of Baltimore, up to the old city limits, provided that on completion of such improvements, the portions of the roads so improved within the city limits shall be city streets under the provisions of the city charter," and provided that "where rights, easements and franchises of the United Railways and Electric Company of Baltimore, its successors and assigns, exist upon any turnpike or private right of way in the Annex which may be improved hereunder, then said rights, easements and franchises may (if the Mayor and City Council of Baltimore and said railways company, its successors and assigns fail to agree upon terms of purhase or surrender) be condemned by the Mayor and City Council of Baltimore under the provisions of Chapter 274 of the Acts of 1904, and Chapter 566 of the Acts of 1906, or in the exercise of its general powers of condemnation, the cost thereof to be defrayed out of the loan provided for in said first mentioned Act, or out of the ordinary. proceeds of municipal taxation; provided, however, that the provisions of said Act of 1906 shall be obligatory upon, and not discretionary with, the Mayor and City Council of Baltimore and the Board of Estimates, and the price to be charged for new rights, franchises and easements similar to those condemned, shall be the same as the amount of the condemnation award."

Section 32C is as follows: "If the State Roads Commission shall determine that the public necessity or convenience, or that the purposes of this Act require that any turnpike, or part thereof, whether maintained as such by any turnpike

company or otherwise, or whether formerly maintained as such and now abandoned by any turnpike company, or that any public road in whole or in part in any county or counties, and forming a section of a through route or continuous thoroughfare between two or more important points in the State, should be taken charge of by said Commission for the State for the purposes of this Act, then, as to such public road or abandoned or acquired turnpike, whether acquired by purchase or condemnation, the said Commission shall file a certified copy of the plan thereof in the office of the County Commissioners for the county or the several counties in which said section or sections of road or turnpike may be situated, and setting forth its purpose to acquire and to take over the same, and said Commission thereupon, without any further procedure, shall acquire and take over any such and all county roads, turnpikes or sections thereof or interests or rights therein, as in its judgment may be necessary or proper for the purpose of this Act, and with full power to widen, relocate, change or alter the grade or location thereof; and said Commission shall have full power so to take over and take possession of any county road or abandoned turnpike, and to accept by gift or surrender, and to acquire by purchase or condemnation, any and all existing turnpikes or any sections thereof, or any rights or interests therein, subject to any outstanding occupation, use or franchise of any electric railway company or other public service corporations; and thereafter all highways, however acquired hereinunder, shall be State highways and shall be constructed, improved and maintained by said Commission for the State and at its expense, except as provided in Section 32B."

Section 32E provided, "that said Commission shall keep all State highways reasonably clear of brush and maintain same in good condition; shall cause suitable shade trees to be planted thereon, if practicable, and may establish and maintain watering troughs upon said highways. No opening shall be made in any such highway, nor shall any structure be

placed thereon, nor shall any structure which has been placed thereon be changed or renewed, except in accordance with a permit from the Commission, which shall exercise complete control over such highways, except as herein otherwise provided. No State highway shall be dug up for laying or placing pipes, sewers, poles, wires or railways, or for other purposes, and no trees shall be planted or removed or obstruction placed thereon without the written permit of the State Roads Commission, or its duly authorized agent, and then only in accordance with the regulations of said Commission; and the work shall be done under the supervision and to the satisfaction of said Commission; and the entire expense of replacing the highway in as good condition as before shall be paid by the persons to whom the permit was given or by whom the work was done; provided, however, that no electric railway company in operation upon any public or private road or existing or abandoned turnpike when acquired hereunder shall be disturbed in its operation or in the maintenance of its roadbed and overhead construction and all necessary repairs, together with the maintenance of the space between its tracks and two feet on each side thereof shall be performed by such railroad company under the supervision and to the satisfaction of said Commission. Said Commission may give suitable names to the State highways and may change the name of any highway which becomes a part of a State highway. They shall erect suitable guide posts at convenient points along State highways."

In 1910 the Legislature passed an Act, Chapter 116, page 304, "enlarging the powers of the State Roads Commission as created by Chapter 141 of the Acts of 1908"; and "providing, also, for the enlargement of the work of said commission and making the necessary appropriations of money; and for an additional bond issue for the purpose of carrying out the provisions of this Act." This Act authorized the Commission to acquire, construct and maintain bridges for the purpose of making connection between any highways or

parts of any highway constructed and improved by it; to acquire by purchase, condemnation or otherwise the Conowingo Bridge across the Susquehanna River, to build a bridge across the Nanticoke River, and to construct a highway to be known as the Annapolis and Baltimore Boulevard, and provided that "Nothing in any of the foregoing sections or in the provisions of any Act adding to or supplementing Chapter 141 of the Acts of 1908 (creating the State Roads Commission) shall be construed as modifying or changing the provisions of said last named Act, in so far as the same define and regulate the rights of any electric railways company in operation upon any public or private road or existing or abandoned turnpike," and further providing that "Whenever any State road crosses the grade of the line of any railroad worked by steam or other power, the State Roads Commission shall have the power to contract with such railroad for the construction of any bridge, archway, or culvert that may be needed for the purpose of any overgrade or under-grade crossing; and to provide by contract or otherwise for the maintenance thereof. Provided, that one-half of the construction cost of such bridge, archway, culvert or roadbed shall be paid for by the railroad and one-half by the State Roads Commission."

On the 29th of April, 1909, the Commission and the United Railways and Electric Company of Baltimore City entered into an agreement by which the Railways Company, "to the extent of its ownership and interest in the Harford, the Baltimore and Jerusalem, and the York Turnpike roads," agreed that the same should be transferred to the commission without charge other than the cost, if any, of perfecting the title, "subject, however, to any and all railway easements and rights of way now existing," and subject to the further provisions of the contract, among which were the following: "Where any tracts owned or operated over by the company now exist on any road which the commission may acquire and improve all changes made necessary by the

work of the Commission shall be done by the company to the satisfaction of the commission and the expense incurred shall be paid by the Commission." "The company shall duly keep in repair the space between the rails of its tracks and the two-foot adjacent space, as provided by the State Roads Law; but, except by mutual agreement, it shall not be disturbed in the use of or required to change, the existing character of its rails, ties, ballast, roadbed or overhead construction; but the company will, at the request of the commission, lower or raise its tracks so as to conform with the adjacent roadway,—the expense incurred by any such change to be borne by the Commission." "The word tracks shall be taken to include switches, turnouts and electrical construction, unless such inclusion would be unreasonable. The formal Deed or Acts or Instruments of Surrender by and on behalf of the several turnpike companies to the Commission shall in terms recite and reserve the rights of the company hereunder."

The agreement of counsel filed in the case states that after the execution of the above agreement "certain members of the State Roads Commission took the position that its terms were broader then they had intended them to be; that they had not intended to bind the Commission in regard to roads other than the three roads specified by name in said contract, namely, the York, Baltimore and Harford and the Baltimore and Jerusalem turnpike roads; that they thought that the Railways Company ought to enter into a supplemental agreement so that—as to the roads other than the three roads which the Railways Company had agreed to procure to be turned over to the Commission—the rights or obligations of the Commission in regard to the Railways Company's structures thereon should be passed upon and determined by the Courts. The Railways Company's position was that the agreement of April 29, 1909, was understood by the parties thereto and was intended to be exactly as it was. The company agreed, however, to make a supple-

mental agreement as requested by the Commission." The Railways Company and the Commission accordingly entered into a supplemental agreement on the 7th of July, 1910, by which they agreed that the agreement of April 29, 1909, should be applicable to the roads referred to, "and that, as to all other roads on which the United Railways and Electric Company has or operates any tracks, the State Roads Commission shall proceed with such improvements or works as it may determine to make, subject to the provisions of Chapter 141 of the Acts of 1908 and any Acts of the General Assembly supplementary thereto, it being particularly agreed that as to all such other roads last aforesaid the said Commission shall in the first instance, pay the costs and expenses of all changes in the tracks, roadbed and overhead construction of the said Railways Company, caused by the works or improvements made by the said Commission, and that the ultimate liability for the costs and expenses of said changes shall be determined by the Courts according to law." The agreement further provided that as to all other roads than those mentioned in the agreement of April 29th, 1909, the work of changing said tracks, roadbed and overhead construction of the company should be done by the company under the supervision and to the satisfaction of the Commission; that the payments to be so advanced by the Commission should be made on the 15th day of each month, and for the amount of the costs and expenses shown by vouchers, approved by a responsible official of the company and furnished by the company to the Commission not later than the 8th day of each month and approved by the Commission "to have been actually incurred for the changes in the tracks, roadbed and overhead construction of said railways company during the calendar month last preceding the 15th day of each month aforesaid caused by the works and improvements made by the Commission upon said roads, and the further and additional sum of ten per cent upon the amount of said

actual costs and expenses for each said calendar month for tools and supervision provided by said Railways Company."

Under the supplemental agreement referred to the Commission undertook the improvement of the Falls Road, in Baltimore County and Baltimore City, the Baltimore and Liberty Turnpike Road, within the present limits of Baltimore City, known as Garrison Avenue; First Street, in Brooklyn, Anne Arundel County, and Maryland Avenue, in Westport, Baltimore County. In reference to each of these roads the Commission and the Railway Company entered into a further agreement specifying the changes to be made by the Railways Company in the location, grade, rails and construction of its railway so as to conform to the specifications and requirements of the Commission, and further agreeing that the cost of said changes should be paid by the Commission and that the ultimate liability therefor should be judicially determined.

This suit was brought by the Commission in the Superior Court of Baltimore City to recover from the Railways Company the amounts paid by the Commission to the company in accordance with the agreements referred to.

In the agreement of counsel it is stated that the Commission expended for the relocation of the tracks and structures of the Railways Company on the roads mentioned the following amounts: On Falls Road, in Baltimore County, $25,209.75; on Falls Road, within the present city limits, $4,306.32; on the Baltimore and Liberty Turnpike Road, now Garrison Avenue, $40,972.54; on First Street, Brooklyn, $10,616.66; on Maryland Avenue, Westport, $6,811.44, which amount in the aggregate to $87,916.68, and it was agreed that if the Court should find for the plaintiff, "in whole or in part," the above figures should be used by the Court "as a basis upon which the amount" of its judgment should be ascertained. It was further agreed that by reason of the changes and relocations of the company's tracks, roadbed and structures required by the Commission, the com-

pany incurred the cost of additional changes in its tracks, etc., for which it makes no claim against the Commission, to the following amounts: On Falls Road, $16,382.39; on the Baltimore and Liberty Turnpike Road (Garrison Avenue), $12,972.31; on First Street, Brooklyn, $3,839.66; on Maryland Avenue, Westport, $5,112.82; miscellaneous, labor and material, $589.89, amounting in the aggregate to $38,897.03; that the changes and relocations referred to above as having cost $87,916.68, the amount which the Commisson now seeks to recover, were necessitated by the plans and specifications adopted by the Commission for the improvement of the several roads mentioned, and that the work was done in compliance with said specifications and the orders of the Commission.

Prior to the passage of the Act of 1908, Chapter 141, "and until the time the structures of the railways were removed at the instance of the State Roads Commission, the Railways Company maintained its tracks and structures upon" the roads hereinafter mentioned, as to which the "agreement as to facts" contains the following statements: "The defendant's structures in Baltimore County were located under and in accordance with grants executed in 1897 from the president, managers and company of the Falls Turnpike Road, the said grants setting forth a consideration of five thousand dollars and purporting to convey the right to the Falls Road Electric Railway Company to construct, maintain and operate its railway, and also under and in accordance with the charter of said company. The charter of the Maryland Traction Company, which was incorporated under the General Law, was amended by the Act of 1896, Chapter 360, which changed its name to the Falls Road Electric Railway Company and gave certain additional powers to that company. The rights of this company, as well as the rights of the other railway companies referred to in this agreement, are now vested in the defendant, The United Railways and Electric Company of Baltimore. The

Falls Road Turnpike Company was chartered by the Act of 1804, Chapter 91, for the purposes set forth in its charter. Some years thereafter the Falls Road Turnpike Company abandoned the Turnpike Road moving its gates therefrom and the State Roads Commission took over and acquired it as an abandoned road. * * * The Mayor and City Council of Baltimore acquired the portion of Falls Road within the present city limits by deeds from the president, managers and company of the Falls Turnpike Road to the Mayor and City Council of Baltimore. The railway structures upon the Falls Road, within the present city limits, were constructed and maintained under an ordinance of the Mayor and City Council of Baltimore, Ordinance No. 105," approved June 11, 1896 (p. 52).

"One of the tracks of the Railways Company on the Baltimore and Liberty Turnpike Road in Baltimore City, now known as Garrison Avenue, was constructed under and in accordance with grants from the Baltimore and Liberty Turnpike Road in 1894 to the Baltimore Traction Company, said grants purporting to convey to the said company the right to construct, maintain and operate its railway, and under and in accordance with the charter of said company. The Baltimore and Liberty Turnpike Company was chartered by the Act of 1860, Chapter 274. This charter was amended by the Act of 1902, Chapter 203. The other track of the Railways Company, upon what is now Garrison Avenue as widened, was located and maintained along and to the side of the turnpike under and in accordance with grants acquired from property owners of the property abutting upon the Turnpike Road. Where the Railways Company's structures have been relocated along the Liberty Road, that is upon Garrison Avenue as widened, the structures have been moved so that both tracks are now located in the center of the bed of Garrison Avenue as widened, the space which was formerly occupied by the track of the defendant, which was located under grants acquired from the abutting property

owners before said tracks were relocated, having been in-
cluded in the widened Garrison Avenue as improved by the
State Roads Commission. By deed dated May 21, 1910, the
Baltimore and Liberty Turnpike Company conveyed, as-
signed, released and quit-claimed unto the State Roads
Commission all its rights, title, interest and estate in, to and
over that portion of its turnpike road within the present
limits of the City of Baltimore. The agreement for the
work on Garrison Avenue was entered into by the Railways
Company and the Roads Commission on October 17, 1910,
and the work, including the relocation of the tracks of the
company, was commenced on the 19th day of October, 1910,
and was finished on the 14th day of December, 1911. Gar-
rison Avenue as at present widened, was widened by the
Commissioners for Opening Streets, acting as the Annex
Improvement Commission, under the Act of 1904, Chapter
274, and Ordinance No. 216 of March 6th, 1905. With re-
spect to the franchise and structures of the Railways Com-
pany upon said Garrison Avenue, the agreement or arrange-
ment embraced in the following correspondence and resolu-
tion of the Board of Estimates was made by the company
and the City of Baltimore, to wit:

" 'December 10, 1910.

" 'Edgar Allan Poe, Esq., City Solicitor.

" 'Dear Sir: In order to remove any possible
doubt as to our understanding relative to the Garrison
Avenue situation, I am giving below a memorandum
outline of plan, and will be obliged if you will look it
over and let me know whether or not it conforms to
your ideas.

" 'The City is endeavoring to secure quit-claim deeds
or deeds to the reversion from the owners of the 10-
foot strip to the side of the turnpike over which this
company has an easement. When the City has ob-
tained as many deeds as practicable, it will acquire
the remaining portion of this strip through condem-
nation proceedings.

" 'The City will institute condemnation proceedings against the rights and easements of this company upon the Liberty Road or Garrison Avenue as widened or intended to be widened, excepting from the effect of such condemnation all of this company's structures and removable property of every kind; and, before the final confirmation of the condemnation proceedings, the City will have introduced and passed an ordinance bringing the tracks under the graduated park tax, such ordinance to be on the general outline of the Seventh Street or Bloomingdale Road ordinance, as far as the latter is applicable. Of course, the provision as to the sub-grading and ballast will not apply, as the work is to be done by the State Roads Commission.

" 'The City is to take care of any claim or claims of Mr. Marburg or others growing out of or in connection with the yearly rental or charge of $250 for a single track on the Liberty Road,—by making Mr. Marburg or the proper person or persons parties to the condemnation proceedings.

" 'This company is not to oppose a nominal award in the condemnation proceedings after the passage of the above-mentioned ordinance, and is to receive no compensation other than this nominal award for its rights along the Liberty Road or the 10-foot strip adjacent thereto.

" 'Very truly yours,

" 'J. Pembroke Thom,

" 'Assistant General Counsel.'

" 'December 13, 1910.

"J. Pembroke Thom, Esq.,

" 'Assistant General Counsel,

" 'United Railways & Electric Co., Baltimore.

" 'Dear Sir: I have your favor of the 10th, relating to the Garrison Avenue situation, in which you outline the plan proposed to be followed. The plan as outlined in your letter meets with my approval,

and is in accordance with the understanding reached between us. I will take the matter up before the Board of Estimates and let you know whether the plan is also acceptable to the Board.

" 'Truly yours,

" 'Edgar Allan Poe,

" 'City Solicitor.'

" 'Baltimore, December 14, 1910.

" 'Edgar Allan Poe, Esq.,

" 'City Solicitor.

" 'Dear Sir: Your letter of the 13th instant, confirming the understanding as outlined in my letter to you of the 10th instant, in regard to the Garrison Avenue situation, to hand. I will be glad to receive advice from you that the plan is acceptable to the Board of Estimates, after the matter has been laid before that body.

" 'Very truly yours,

" 'J. Pembroke Thom,

" 'Assistant General Counsel.'

" 'Copy of Minutes of Board of Estimates, December 20, 1910: City Solicitor Poe presented letter of Mr. J. Pembroke Thom, Assistant General Counsel of the United Railways and Electric Company, relative to the institution of condemnation proceedings upon Garrison Avenue. Upon motion of Mr. Hooper, seconded by Mr. Mahool, it was moved that the plan for the condemnation proceedings on Liberty Road or Garrison Avenue be approved by the City, the City to take care of any claim or claims of Mr. Marburg, or others, growing out of or in connection with the yearly rental or charges of $250.00 for a single track on the Liberty Road, by making Mr. Marburg or the proper person or persons parties to the condemnation proceedings.'

" 'February 3, 1911.

" 'J. Pembroke Thom, Esq.,

" 'Assistant General Counsel,

" 'United Railways & Electric Co., Baltimore.

" 'Dear Sir: I write to state that your letter, in which you outlined the understanding that had been reached between you and myself, in reference to the plan of procedure in connection with the laying of the railway tracks, etc., on Garrison Avenue, was submitted by me some time ago to the Board of Estimates, and the Board gave the plan its approval.

" 'Truly yours,

" 'Edgar Allan Poe,

" 'City Solicitor.'


" 'Baltimore, February 4, 1911.

" 'Edgar Allan Poe, Esq.,

" 'City Solicitor.

" 'Dear Sir: I beg to acknowledge receipt of your letter of the 3rd instant, in which you state that the understanding outlined in my letter to you of December 10, 1910, reached between you and myself in reference to the plan or procedure in connection with the laying of railway tracks, etc., on Garrison Avenue, was submitted to the Board of Estimates and that the Board gave the plan its approval.

" 'Very truly yours,

" 'J. Pembroke Thom,

" 'Assistant General Counsel.'


"The proceedings were begun by a notice inserted in the papers by said Annex Commission on November 10, 1911, and have been completed, that is, all appeals have been disposed of at the date of this agreement. In the proceedings for condemning and opening Garrison Avenue, a nominal award was made to the United Railways and Electric Company for their pre-existing rights and franchises, no award being made to William A. Marburg, who held an outstanding obligation for the payment of $250 a year, redeemable at

$5,000, connected with said rights and franchises as to one track. Appeals were taken by both Marburg and the United Railways Company. In the Marburg appeal there has been an award of $3,250, to be paid him by the city, and the nominal award to the Railways Company has been confirmed, in pursuance of an agreement entered into in the *Marburg case* between the City Solicitor, the counsel for the Railways Company, and counsel for Marburg, by virtue of which the United Railways and Electric Company is to be given a new franchise under the Act of 1906, Chapter 566, the three years' exemption from the park tax to date from January 1, 1912, and the question whether or not the United Railways shall be charged the $3,250 to be adjusted between the Railways Company and the Board of Estimates, or, in default, to be submitted to arbitration. It is expected that the ordinance will be introduced and passed in a short while.

"The Railways Company's tracks and structures on First Street, Brooklyn, Anne Arundel County, were located and maintained in accordance with the charter provisions of the Baltimore and Curtis Bay Railway Company and under and in accordance with a deed from the South Baltimore Harbor and Improvement Company of Anne Arundel County to the Baltimore and Curtis Bay Railway Company, which deed purported to grant the right to the Railways Company to construct and maintain a railway over and upon First Street. The Baltimore, South Baltimore and Curtis Bay Railway Company was chartered by Chapter 505 of the Act of 1890, and its name was changed to the Baltimore and Curtis Bay Railway Company by the Amendatory Act of 1892, Chapter 574."

"The Railways Company's structures, located on Maryland Avenue, Westport, were laid in accordance with the provisions of Chapter 203 of the Acts of 1894; under and in accordance with a deed from the South Baltimore Company to the Shore Line Electric Railway Company and the Baltimore Traction Company executed May, 1896, and under and in accordance with orders of the County Commissioners

of Baltimore County, dated September 25, 1895, and January 21, 1896."

In addition to the facts stated in the above agreement of counsel, the plaintiff introduced evidence to show what changes the Railways Company was required to make in its railway and appliances on the several roads referred to in order to comply with the plans, specifications and orders of the Commission; that these changes consisted in raising and lowering the company's roadbed and tracks; moving its tracks from the side to the center or from the center to the side of said roads; repaving the space between its tracks and two feet on either side of its tracks, and in some instances repaving the space referred to with vitrified brick, and in the substitution of new and different rails, poles and appliances for the ones then used by the company. The Commission also offered evidence tending to show that the plans adopted by it, in accordance with which the work referred to was done by the company, were necessary for the proper improvement and construction of the roads; that at the time the company's railway was constructed on First Street, Brooklyn, said street was a public road of Anne Arundel County, and that Maryland Avenue, Westport, at the time the company's railway was located thereon, was one of the public roads of Baltimore County.

The Railways Company offered evidence tending to show that some of the changes the company was required to make in the location, construction, etc., of its railway in order to comply with the requirements of the Commission were not necessary for the proper construction or improvement of the roads in question, were very expensive and were not justified by the conditions and circumstances under which they were made; that no condemnation proceedings have been instituted by the Commission for the acquisition of any of the roads referred to in this case, or for the acquisition of any of the defendant's rights in or properties on said roads; that at the time the bill, which became the Act of 1908, Chapter 141, was introduced in the Legislature the defendant and other

companies operated railway lines upon the roads and turn-pikes of the State; that the bill, as originally introduced, did not provide for the improvement of public highways within the limits of the City of Baltimore, and that section 32B was amended in the Senate so as to authorize the improve-ment of such portions of the main roads of the State as lie within the limits of Baltimore City, and was further amend-ed by adding that part of Section 32B which authorizes the Mayor and City Council of Baltimore to condemn, etc., the right of way of the Railways Company upon any turnpike improved by the Commission. The company also offered in evidence the agreement between the South Baltimore Com-pany, the Shore Line Electric Railway Company and the Baltimore Traction Company, dated the 18th of May, 1896, and the orders of the County Commissioners of Baltimore County, under which its railway was originally constructed upon Maryland Avenue, Westport, and the deed from the South Baltimore Harbor Company to the Baltimore and Curtis Bay Railway Company, dated March 13th, 1893, for its right of way on First Street, Brooklyn.

At the conclusion of the testimony the Court below granted the plaintiff's seventh, eighth, ninth and eleventh prayers and rejected the prayers of the defendant, and from the judgment in favor of the plaintiff for $87,916.68, the total amount paid by the Commission to the defendant for the work, etc., done by the company upon the several roads in question, the defendant has appealed.

The granted prayers of the plaintiff are as follows:

*Seventh*—"The plaintiff prays the Court to rule, as a mat-ter of law, that by a true construction of the Act of 1908, Chapter 141, and amendments thereof, the duty rests upon the United Railways and Electric Company of Baltimore, in the event of the improvement by the State Roads Commis-sion, under said Act or amendments thereof, of any public road upon which there had been constructed, prior to such improvement, tracks and other railway structures of said company, at its own expense, to shift, adjust and take care

of its said tracks and structures so as to conform to the said road as improved by said Commission. And if the Court find that Maryland Avenue, Westport, and First Street, Brooklyn, were public roads under the eighth prayer of the plaintiff, then under plaintiff's ninth prayer and by a true construction of the agreement of facts offered in evidence at the trial of this case, the verdict of the Court sitting as a jury should be for the plaintiff for the amount mentioned in said agreement, to wit, eighty-seven thousand nine hundred and sixteen dollars and sixty-eight cents ($87,916.68)."

*Eighth*—"The plaintiff prays the Court to rule, as a matter of law, that if the Court find that Maryland Avenue, Westport, and First Street, Brooklyn, had been uninterruptedly used by the public as public highways for more than twenty years prior to the construction thereon of the railway tracks of the defendant, and prior to said time has been repaired by the County Commissioners of Baltimore County and Anne Arundel County, respectively, and during all of said time had been open, free and unobstructed for the use of the public, and so used by the public, then the said roads were public roads at the time the railway tracks were laid thereon."

*Ninth*—"The plaintiff prays the Court to rule, as a matter of law, under the Acts of Assembly relating to the Falls Roads and the Liberty Turnpike, referred to in the evidence, that the said turnpikes were public roads at the time of the laying of the railway tracks thereon, in the meaning of the principle of law; that where the right to use any public road is granted to any railway company such right is subject to the superior right of its use as a public road and subject to the duty of the railway company, upon any improvement of said roads, to shift and adjust its tracks and structures at its own expense, so as to accommodate them to the improved condition of said roads."

*Eleventh*—"The plaintiff prays the Court to rule, as a matter of law, that by the agreement between the City and the United Railways and Electric Company, relating to Gar-

rison Avenue, as shown by the correspondence included in the Agreed Statement of Facts, offered in evidence, the United Railways and Electric Company was obliged, at its own expense, to remove and relocate its tracks and readjust them to the new Garrison Avenue, as then contemplated and subsequently constructed."

The contentions of the appellee are (1) that all of the roads and turnpikes in question were public roads and highways, and that the State in the exercise of its police power to improve its public highways for the convenience and welfare of the public may require a railway company using such highways, at its own expense, to relocate its tracks and make such changes in its roadbed and structures as are necessary to enable the State to make such improvements, and to conform with the improvements when made; and (2), that the Act of 1908, Chapter 141, conferred upon the State Roads Commission the right to exercise that power.   In support of the first proposition counsel for the Commission have presented a very elaborate and instructive brief, citing and quoting many cases, Federal and State, to the effect that where a corporation obtains from a municipality the privilege of using a street for its corporate purposes, its use of the street is subject to the power of the municipal authorities to make such improvements and changes in the street as they may deem necessary for the public welfare, without liability to the corporation for any interruption of its use or expense to which it may be subjected in consequence of such changes or improvements, and among the cases relied on are *Kirby* v. *Citizens' Railway Co.,* 48 Md. 168; *N. Balto. Pass. R. R. Co.* v. *Balto.,* 75 Md. 247, and *M. & C. C. of Balto.* v. *Turnpike Co.,* 80 Md. 535.

On the other hand the appellant contends:   (1) That the changes it was required to make in its railway are not within the scope of the police power of the State; (2) that where a railway company has acquired an easement or right of way prior to the opening of a street, it cannot be deprived of

that right by the municipality or by the State in the exercise of the police power; and (3) that the Act of 1908 did not confer upon the Commission the authority to interfere with the use by the Railways Company of the roads and turnpikes in question. In support of the second contention counsel for the appellant in their carefully prepared brief cite and rely upon the cases of *N. C. R. R. Co.* v. *Baltimore,* 46 Md. 425; *Baltimore City* v. *Cowen,* 88 Md. 447; *Balto. & Ohio R. Co.* v. *Baltimore City,* 98 Md. 535, and *Anne Arundel Co.* v. *U. Rys. Co.,* 109 Md. 377.

In the view we take of the case it will not be necessary to consider the propositions presented by the appellee's first and the appellant's first and second contentions, for after a very careful examination of the provisions of the Act of 1908, Chapter 141, we think it is clear that the Legislature never intended to confer upon the Commission the power upon which it now relies.

In Section 32B the Commission was empowered to select, construct, improve and maintain a general system of improved state roads and highways through all the counties of the State, and was directed to include in its work the improvement of such portions of the main roads selected by it as a part of the system as lie inside the limits of the City of Baltimore, "up to the old city limits." To that end the Commission was given power to "condemn, lay out, open, establish, construct, extend, widen, straighten, grade and improve any road of the system, in any county of the State." and in order to enable it to exercise the powers thus conferred, it was given the further power to *"acquire for the State of Maryland,* by agreement, gift, grant, purchase or condemnation proceedings—any private road or roads whatsoever, or private property or rights of drainage for public use, whether belonging to private individuals, or to turnpike companies or other corporations, and including avenues, roads, lanes or thoroughfares, rights or interest, franchises, privileges or easements, that may be, in its judgment, desir-

able or necessary to complete said system of roads or to carry out the purpose of this Act." In this careful enumeration of the many powers granted to the Commission for the purpose of enabling it to accomplish the ends desired, there is not a suggestion of a power to take, acquire or disturb any interest, easement or right, of any individual or corporation, however obtained, except by "agreement, gift, grant, purchase or condemnation," and the fact that the Act expressly states the manner in which all property, rights and interests necessary for the purposes of the Act may be acquired, negatives the idea that the Legislature intended to confer upon the Commission the power to disturb these rights under the authority of the police power of the State.

Again, in Section 32C it is provided that when the Commission shall determine that public necessity or convenience or the purposes of the Act require that any turnpike, or part thereof, whether maintained as such or abandoned, or any public road should be taken charge of by the Commission for the State, it "shall acquire and take over" such "county roads, turnpikes, or sections thereof or interests therein," and that section further provides, "and said Commission shall have full power to so take over and take possession of any county road or abandoned turnpike, and to accept by gift or surrender and to acquire by purchase or condemnation, any and all existing turnpikes or any sections thereof, or any rights or interests therein, subject to any outstanding occupation, use or franchise of any electric railway company or other public service corporation." While this section authorizes the Commission to take over any county roads or abandoned turnpikes, it requires it to acquire by purchase, etc., all existing turnpikes and any rights or interests therein, and distinctly recognizes the right of an electric railway to continue its occupation and use of such roads and turnpikes.

The legislative intent that railway companies occupying the roads and turnpikes acquired and taken over by the Commission should not be disturbed in the maintenance of

their roadbeds and use of their rights and easements is even more clearly expressed in Section 32E of the Act. That section, after declaring that the Commission shall have complete control of the State highways, "except as herein otherwise provided"; that no State highway shall be dug up for any purpose, or any obstruction placed thereon without the "written permit" of the Commission, and that when a permit is given the work shall be done under the supervision of the Commission at the expense of the person to whom the permit is given, then says, "provided, however, that no electric railway company in operation upon any public or private road or existing or abandoned turnpike when acquired hereunder shall be disturbed in its operation or in the maintenance of its roadbed or overhead construction, and all necessary repairs, together with the maintenance of the space between its tracks and two feet on each side thereof shall be performed by such railway company under the supervision and to the satisfaction of the Commission."

It is urged by the appellee that the language of the section we have just quoted should, by reason of its context, be construed as only applying to the highways after the improvements thereof by the Commission have been completed, but apart from the fact that the section referred to, as we have construed it, is in entire harmony with the other provisions of the Act, it is clear that the language used is not open to the construction claimed by the appellee. The provision is, "no electric railway company in operation upon a public or *private road* or existing or abandoned turnpike *when acquired hereunder* shall be disturbed," etc. That cannot be held to refer to an electric railway in operation upon the highway *after* it is completed, when the section expressly says an electric railway in operation upon a *"private road,"* etc., *"when acquired."* If the contention of the appellee that under the Act the Railways Company may be required, at its own expense, to change the location of its roadbed whenever in the judgment of the Commission public convenience,

etc., requires it, is sound, then the provision referred to would be meaningless, for it could not change the location of its roadbed without being "disturbed in its operation or in the maintenance of its roadbed." As suggested by counsel for the appellant the contention of the appellee is further answered by the provision of the supplemental Act of 1910, Chapter 116, which declares that nothing in that Act or any Act adding to or supplementing the Act of 1908, "shall be construed as modifying or changing the provisions of said last named Act, in so far as the same define and regulate the rights of any electric railway company in operation upon any public or private road or existing or abandoned turnpike." In the Act of 1910 there is no such context as that relied on by the appellee, and the railways there referred to, as in the section we are now considering, are the railways in operation "upon any public or private road," etc. The provision of section 32E, requiring the railway companies to keep in repair the space between their tracks and two feet on each side thereof was doubtless borrowed from an old Act, Section 383 of Article 23 of the Code of 1912, and inserted to save, to that extent, the expense imposed upon the State by other provisions of the Act of 1908 of maintaining the improved highways. That the Act of 1908 does not give to the Commission the powers claimed by it is, we think, also shown by the further provision of the Act of 1910, Chapter 116, which authorizes the Commission, where a State road crosses a railroad, to contract with the railroad company for the construction of a bridge or archway for an "over-grade" or "under-grade" crossing, and provides that the Commission shall pay one-half of the cost of such bridge or archway and that the other half shall be paid by the railroad company. If it was the purpose of the Legislature to impose upon railway companies the expenses of changing the grade of their roadbeds and location of their tracks on the public roads and turnpikes improved by the Commission there is no good reason why railroads should have been relieved of

one-half of the cost of constructing an "under-grade" or "over-grade" crossing.

Even if there was any doubt about the meaning of the Act of 1908, certainly there could be no presumption in favor of a grant of such powers as the appellee claims in this case. In the case of *State* v. *Mott,* 61 Md. 297, CHIEF JUDGE ALVEY said: "Whatever power can be properly exercised by the municipal authorities of the City of Baltimore over the rights and property of the citizen, under the denomination of police regulations, must be derived from the Legislature of the State. It must be by express grant, or by fair and reasonable intendment; for otherwise the trades and business of the people would be at the mercy, and be made dependent upon the caprice, of those who might exercise municipal power, instead of being governed and regulated by the general law of the land. Within the power granted, the degree of necessity or propriety of its exercise rests exclusively with the proper corporate authorities; but in all cases the power exercised, or attempted to be exercised, must depend upon the nature, and extent of the power granted, and whenever the question of the existence or limit of the power is raised, it becomes the plain duty of the Courts to see that the corporate authorities do not transcend the authority delegated to them." *Heiskell* v. *Baltimore,* 65 Md. 148-149; *Hagerstown* v. *Balto. & O. R. R. Co.,* 107 Md. 188.

As the Commission was not authorized by the Act of 1908 to require the Railways Company, at its own expense, to make the changes referred to in the grade and location of its railway, it can make no difference in this case whether its roadbeds were constructed on its private rights of way or upon the public roads and highways of the State.

The agreement of counsel shows that the Mayor and City Council of Baltimore acquired that part of the Falls Road which is located within the city limits by deeds from the Falls Road Turnpike Company, and that the railway of the appellant on that part of the turnpike was constructed under

the provisions of Ordinance 105 of 1896. The appellee, relying upon the case of *M. & C. C. of Balto.* v. *Turnpike Co., supra,* insists that that part of the Falls Road Turnpike, after it was ceeded to the city, became a public street of the city, and that under the provisions of said ordinance the Railways Company was bound to make its tracks conform to any change in the street at its own expense. The Act of 1908 provided that the roads and highways to be improved by the Commission shall be first taken over and acquired by it for the State, and after requiring the Commission to improve such parts of turnpikes as are within the city limits, between the present and old city limits, declares that the same, when the improvements have been completed, shall become "city streets" and subject to the provisions of the city charter. It would seem therefore that under the Act of 1908, if we assume that a city street may be improved by the Commission, turnpikes within the present city limits, while in the course of construction or improvement by the Commission, must be regarded as belonging to and under the control of the State, and that all contracts made by the Commission for such construction or improvement must be construed with reference to the powers, duties and liability of the Commission under the Act creating it. As the contract under which the Railways Company made the changes referred to was made with the Commission, and the work was done in compliance with *its* requirements, the liability of the parties to that contract for the cost of that work must be determined by the provisions of the Act of 1908, and the Commission cannot escape liability for such expense on the ground that *the city* can require the Railways Company to make its tracks conform to any change *the city* may make in the grade of said street.

The agreement of counsel as to the Baltimore and Liberty Turnpike, Garrison Avenue, shows that the Commission acquired all of the rights of the Turnpike Company by a deed dated May 21st, 1910; that the contract between the Com-

mission and the Railways Company, under which the changes in the railway was made and the work was done, was executed on the 17th of October, 1910, and that the work was commenced on the 19th of October, 1910, and completed in December, 1911. At the time the expense which the appellee now seeks to recover was incurred the turnpike belonged to the State, and was under the control of the Commission as the agency created by the State for the improvement of the highway, and the change in the company's railway was made and the work was done in accordance with the contract with the Commission. The contract contained in the correspondence between the representatives of the city and Railways Company makes no reference to the contract between the Railways Company and the Commission, or to the work to be done or the liability of the parties under it, but relates only to the acquisition of the right of way and easement of the Railways Company in Garrison Avenue, and to bringing the Railways Company under the provisions of the acts and ordinances relating to the Park Tax. The agreement on the part of the Railways Company not to oppose a nominal award for its easement in the proposed condemnation proceedings cannot be construed as a waiver of any rights it had under its contract with the Commission, and to give it such a construction would be to import into the agreement terms it does not contain and which would be entirely foreign to the subject matter of the contract. That the parties to this correspondence were not dealing with the liability of the company for the work to be done by it under its contract with the Commission, is further indicated by the following statement in the letter of Mr. Thom of December 10th, 1910, where, referring to the "Bloomingdale road ordinance," he says: "Of course, the provision as to the sub-grading and ballast will not apply, as the work is to be done by the State Roads Commission."

There is nothing in Section 32B to justify a different construction of the agreement contained in the correspondence,

or to support the contention of the appellee. That section, as we have said, provides that when the improvement of a turnpike within the city limits has been completed by the Commission the turnpike shall become a city street, and the city is authorized by the concluding provision of that section to condemn any right of way or easement of the Railways Company upon or in such turnpike, the costs thereof to be paid by the city. That section does not authorize the Commission to require a railway company to move its tracks, at its own cost, and the changes made by the appellant in its railway tracks and structures under its contract with the Commission, and in compliance with its plans, were practically completed before the proceedings referred to in the correspondence were begun.

The evident intention of the Legislature as expressed in the provisions of the Act of 1908 was to provide for the entire cost of the construction and improvement of such roads and turnpikes as might be selected by the Commision as part of the system of main roads and highways of the State, and there is nothing in the Act to suggest that any part of that expense was to be borne by electric railway companies whose rights the Act expressly declares shall not be disturbed.

It follows from what we have said that there was error in the ruling of the Court below in granting the plaintiff's seventh and eleventh prayers; that the defendant's first prayer, which asserted that "under the pleadings, there is no evidence legally sufficient to entitle the plaintiff to recover, and the verdict should be for the defendant," should have been granted, and that the judgment appealed from must be reversed without granting a new trial.

> *Judgment reversed, with costs to the appellant without awarding a new trial.*