# SUPERIOR COURT OF BALTIMORE CITY.

Filed July 16, 1918.

JOSHUA LEVERING, ET AL.,

VS.

GEORGE WEEMS WILLIAMS, ET AL.

*Isaac Lobe Straus* for petitioners.

*Robert F. Leach, Jr., Geo. R. Gaither, Eli Frank* and *Oscar Leser* for respondents.

DAWKINS, J.—

The decision in this case has been delayed for several reasons, chiefly on account of the filing of the very voluminous briefs after the oral arguments. Both the briefs and arguments have been illuminating and instructive, but in order to give them proper consideration it has been necessary to use considerable time in examining the many authorities cited. It will not be deemed helpful to refer to them by name, but I desire to express my appreciation of the exhaustive research manifested by counsel and the helpful service rendered.

Whilst the case has been discussed from many angles, yet for its present

termination it would only seem advisable to pass upon one controlling question, though as there have been such full and elaborate discussion of the other points that appeared to be involved, it might be advisable as a help in the future hearing of the matter (if such becomes necessary) that some of the views held by this court be announced at this time, even at the risk of a somewhat prolonged discussion.

The sole question before the court is whether or not the demurrer interposed by the plaintiff to the defendants' answer should be sustained. As counsel on both sides of the case have discussed the constitutionality of the ordinance that will hereinafter be mentioned, and as a determination as to this will determine the matter, it would seem proper that the same be now considered.

The purpose of the petition for mandamus in this case is to preserve the sanctity of the Sabbath as a holy day of rest and to see that the Commandment, "Remember the Sabbath day and keep it holy," is obeyed. There is no greater bulwark for a free people to invoke for their safety and peace than to hold to the simple teachings of the fathers and to hold up to the public conscience the loftiest ideals of good and clean living in all ways. As those ideals are cherished by the individual so will their perpetuation keep all that is best for the state in existence. Unless the individual citizen is pure in heart and conduct the state will degenerate. If the highest state of morals is preserved by the citizen it becomes a living, breathing force for good upon the whole body of the people of the commonwealth, so as has been said by a distinguished American lawyer: "The observance of the Sabbath is a part of Christianity, * * * the statutes against blasphemy," and such laws "proceed on this great broad principle that the preservation of Christianity is one of the main ends of government," and "the Sabbath is rendered the moral conservation of nations. The omnipresent influence that the Sabbath exerts upon the masses of minds is by arresting the stream of worldly thoughts, interests and affections and by stopping the din of business and unloading the mind of its cares and responsibilities and the body of its burdens." Whilst a willing concurrence in all these ideas as to the proper observance of the Sab-

bath is given and the belief is held that no more debasing thing can occur in a community than a wilful or open desecration of the day, yet it is quite impossible to say just where the line of proper observance ends and desecration begins.

It is much a matter of training and individual opinion. The day of rest generally adopted is Sunday. "There are and always will be honest differences of opinion as to how Sunday should be spent, but the advantages of having a weekly day of rest, from a mere physical and political standpoint, are too apparent to permit us to doubt the propriety of having reasonable laws to regulate work on that day. In interpreting them courts must not put unreasonable obstructions upon them," though there may be circumstances when it might be harsh to punish a man for working on Sunday. Judefind vs. State, 78 Md. 570.

It is a far cry from the plain and simple garb of our ancestors to the attire of the present day or from the so-called "Blue Laws" to the freedom of observance or lack of observance of these days of Sunday.

The motives controlling each one as to his conduct is not for us to inquire into at this time. An interpretation of the law should be given that will tend to right living and to confining the people's wish, if there be any doubt. Especially is this pertinent when the sense of the community, through their chosen representatives, with almost complete unanimity, by one branch of the City Council by an unanimous vote and by the other branch of the Council with only one dissenting vote, and by the Mayor's approval, have passed the ordinance in question and thus expressed the views of the people.

The fundamental question here is whether or not Ordinance No. 353 of the Mayor and City Council and approved on May 25, 1918, which provides:

Section 3. (A) Every person who shall fish or hunt or who shall play ball or any other game whatsoever on the Sabbath day, commonly called Sunday, within the limits of Baltimore City, except as hereinafter authorized, shall for each offense pay a fine of one dollar; and every ordinary or public garden keeper who shall suffer or allow in or upon his premises any kind of gaming or sport on the Sabbath day,

shall, for every individual so permitted to offend, pay ten dollars.

(B) Nothing in this ordinance, however, shall be construed as prohibiting or penalizing the playing in the public parks, private parks, on the grounds of organized or incorporated clubs and on open lots on Sunday of the games of baseball, golf, lawn tennis, croquet, basketball, football, lacrosse, quoits, soccer and field and track exercises; provided that any of the games enumerated in this paragraph (b) are played on Sunday between the hours of 2 P. M. and 7 P. M., and provided further that such games are played in neighborhoods where they shall not cause a disturbance of the public peace; and provided that such games shall not be played within one hundred (100) yards of any place of worship where services are being held; and provided further that no admission fee whatsoever to such games shall be charged.

In the event a person violates any of the aforesaid provisions of this paragraph (b), he shall be deemed guilty of a misdemeanor and for each and every offense thereof he shall be subject to a fine of from five to five hundred dollars, the said fine to be collected as other fines are.

(C) And nothing in this ordinance shall be construed as prohibiting or penalizing the playing of any game of golf, lawn tennis, croquet or quoits at any time on Sunday, provided such game be played on private grounds with the consent of the owner or custodian of such grounds, and for exercise or recreation only, and that not more than four persons play together in such games, and that such games be not played within one hundred yards of any place of worship where services are being held, and be not so played as to cause a disturbance of the public peace, and that no person who may be permitted to see such game be charged any fee for such privilege; the meaning of the words "private grounds" as herein used being grounds which are privately owned as distinguished from grounds which are publicly owned or which have been dedicated to the public use.

Conflicts with the State law of Maryland as codified in Bagby's Code, Vol. 3, Art. 27, Sec. 436, p. 446, which provides that "no person whatsoever shall work or do any bodily labor on the Lord's day, commonly called Sunday; and no person having children or servants shall command or wittingly or willingly suffer any of them to do any manner of work or labor on the Lord's day (works of necessity and charity always excepted), nor shall suffer or permit any children or servants to profane the Lord's day by gaming, fishing, fowling, hunting or unlawful pastime or recreation; and every person transgressing this section and being thereof convicted before a justice of the peace shall forfeit five dollars, to be applied to the use of the county," or

Is it a mere extension of the State law with the imposition of further and additional penalties than those imposed by the law? or

Is it a mere amending of the ordinance heretofore passed by the Mayor and City Council? or

Is it a proper exercise of the police power as committed to the Mayor and City Council of Baltimore?

If the last, is it reasonable?

Reversing the order of the questions suggested and answering them out of the order of the asking, it has been said by our Court of Appeals in 124 Md. 393, Hiller vs. State, that "baseball is a fine game, cleaner and freer from danger than some others. It has taken a great hold upon the people. The public interest in it is confined to no one class. All classes are equally attracted by it and thousands assemble to witness the games." Whilst the crowds so attracted may become noisy, even disorderly, yet not necessarily so, just so soon as the behavior of the crowds become offensive, to the law-abiding people, the criminal law is all sufficient as a means of checking the same. It is hardly fair to assume that every one who plays ball and the other games mentioned in the ordinance in the parks, etc. (this proceeding is only directed against the Park Commissioners), will violate the law or become a nuisance in the public estimation. It is hardly the conception of the proper administration of the law to enjoin crimes if we are still to believe that every one is innocent until he is proven guilty. The parks are made for the enjoyment and recreation of the public. On fair days there are crowds of people, the bands are permitted to play, but everything is under regula-

tion. Walking, autoing, boating and other amusements and recreations are permitted. Could the journey be far to a game of baseball without any paid charge in connection with it, or a game of tennis or golf? Must we assume that a participation in these things will make people *per se* law-breakers? Until it can be proven to the contrary there is nothing to show that any greater number of policemen will be necessary to control the crowds and protect the public. We cannot anticipate the playing of professional games by players for hire. The ordinance does not permit this in terms, even though suggested and so ably argued that it might not be clearly prohibited in the ordinance.

There is little if any difference in principle between this any many other agencies for recreational, religious and other helpful purposes, which are provided for the people by those who are paid for services on Sunday.

In Hiller vs. State, supra, the Court of Appeals of Maryland has said that "there are many popular enjoyments which are consistent with the sacredness" of Sunday and the proper observance of the day and that "baseball in itself is a harmless and healthful recreation."

If this be admitted it would hardly be proper to say as a fact that this playing of ball in the parks or the other games permitted is essentially vicious or harmful.

The question of moral injury or shock to the feelings must be shown by proof. The answer denies that any injury can be done by playing ball. Query? Can a mandamus be invoked to prevent a crime or violation of law under such circumstances? Should the remedy be sought without allowing the character of the game to be shown? 42 Maryland, 203, Legg vs. Annapolis.

It would seem immaterial whether the prayer of the petition be to annul the resolution of the Park Board permitting games or to stop the same from being played, the end sought is the same.

"The ordinance of 1827 of the Mayor and City Council of Baltimore City as codified in the Baltimore City Code of 1906, article 31, section 3 reads:

"Every person who shall fish, hunt, pitch quoits or money, fly a kite, play bandy or ball or any other game or sport on the Sabbath Day within the limits of the city, shall for each offense pay a fine of one dollar, and every ordinary or public garden keeper who shall suffer or allow in or upon his premises any kind of gaming or sport on the Sabbath Day, shall for every individual so permitted to offend, pay one dollar."

This ordinance of 1918 under discussion provides as heretofore stated, that playing in the public parks, private parks on the grounds of clubs and open lots on Sunday of the games of baseball, golf, lawn tennis and other games shall not be prohibited or penalized provided they are played between the hours of 2 P. M. and 7 P. M., and where they shall not disturb the public peace or within 100 yards of any place of worship, and that no admission fee whatsoever to such games shall be charged. The penalty for violating the ordinance, it has been seen, is from five to five hundred dollars.

The provisions of the state law already quoted is practically the same as the so-called early "Blue Laws" of 1696. The Act of 1723 is practically a re-enactment of the early act. As observed in the most illuminating brief and learned discussion by counsel for petitioner these Acts all give unmistakable evidence "that their purpose was a religious one, i. e., for sanctifying and keeping holy the Lord's day A general purpose which has been recognized by law givers in all ages as the soundest basis and buttress of civil duty and policy.

Ordinarily gaming means some element of chance. The Century Dictionary defines Gaming as "playing for stakes, gambling, an agreement to risk money on a contest or chance of any kind where one must be a loser and the other a gainer." Persons playing at cards for money are gambling or gaming. There is no gaming in which the element of wager is wanting.

Can it be said that any such element exists *per se* in the games allowed by this ordinance? If this is correct then there is nothing in violation of the State law. It is proper to say, too, that the section of the law, whilst it prevents a person from allowing his children or servants from gaming, etc.,

only seems to prevent him from working or doing bodily labor. Bearing in mind the Hiller case already referred to, it is proper to note that under a Missouri statute prohibiting "games of any kind" it was held that Sunday baseball was not included in the prohibition, and it was held in the same case that "baseball is not a gambling game or productive of immorality," and that it is not proper for the Courts by construction to impair the natural rights of the people to enjoy those sports or amusements that are neither immoral or hurtful to body and soul." Ex parte Neet, 157 Mo. 527.

Injunction has been issued to restrain the game of baseball on Sunday on account of the noise made disturbing the rest and quiet of persons in the neighborhood. Hiller case, supra..

When the theory of the Sunday laws was written in the laws of Maryland and other colonies, Church and State were not separated, slavery existed, personal responsibility for the behavior in a religious way of children and servants was demed a proper subject for legislation. At that time it was deemed proper for the State to support the Church, whatever it might be. A compulsory tax for the maintenance of institutions of a holy character was deemed quite the proper thing for the Legislature to fix. In line with this thought laws were enacted instructing parents and masters as to the training and conduct of children and servants in their religious and other home conduct? The spirit and tendency of the lawmakers and Constitution framers of the present day should be to get away from too much of this paternal idea. Whilst it is true that the State must protect the individual the Courts should not deal with any matter of doctrine or discipline of worship.

There is no greater obligation resting upon a civilized people than that of preserving a properly and orderly observance of the Sabbath. The manner of the observance of that day should be in accord with a healthy and elevated public sentiment. Recreation is not necessarily a nuisance. To prohibit what the people want, the law must be clear and definite. The common law would not seem to authorize the observance as indicated, save for the Statute.

When the Act in question was enacted baseball probably was not known. The hypothesis is apparently assumed in Fearson vs. State, 2 Maryland 210, that indefinite subjects were made unlawful that had theretofore been lawful. If such was the law then it would seem to be unenforceable for uncertainty. If it be certain, then it must embrace all pastimes and recreations, those then known and those to come thereafter. If it can take this range it is surely the most comprehensive and far-reaching statute ever enacted. If the Act of 1723 is not so all embracing, but extends to some games or pastimes it would be difficult to believe that it was meant to include a game that was not known to exist.

If it is meant to apply to pastimes that are unusual or a nuisance by causing the sensibilities of the citizens or the peace and quiet of the community to be disturbed, then such things should be shown to be clearly without the class suggested or else proven to be such by evidence tending to establish the fact.

Many right-minded people have no greater joy or pleasure than a strict and faithful attendance upon the religious services of their choice. Unfortunately we cannot select even one that will suit all. Nor can we compel church attendance, walking, visiting, riding in cars or automobiles, excursions, picnicing, etc., are adopted as outlets for Sunday rest and recreation. None of these things usually interfere with the rest or worship of others nor with the Sunday observance that may appeal to them. With the restrictions in this Ordinance of 1918, can we say that playing games in the parks shocks anyone? Since this Ordinance was enacted no doubt games have been going on in the parks, yet no word has come of any shock to the community.

If the games are forbidden in the parks there is no prayer in the petition seeking to prevent the players from stepping outside of the parks and playing to their hearts' content.

In the case of Johnson vs. Commonwealth, 22 Pa. 102, the Court, in discusing an analogous statute says: "The best one can do is to judge the cases as they arise and to treat them as within the prohibition in the saving clause of the Statute according to

the specific features which each presents."

In the case referred to and relied on by the plaintiff of Coleman vs. Commonwealth, 60 Pa. 380, the Court, in discussing a game of baseball by professionals, said: "The playing of baseball on Sunday is not in itself a crime, but it becomes an unlawful act when it interrupts the repose and religious liberty of the community," so that if it does so interrupt it must be shown by the particular case and its participants accordingly punished.

That decision was made, too, under an Act dating back to 1794, which was expressly enacted to restrain disorderly sports and dissipation, and provides "if any person * * * shall use or practice any unlawful game, hunting, shooting, sport or diversion whatsoever on Sunday."

Whether this Ordinance of 1918 is a modification of the penalties or an extension of the same, it is clearly within the principles of Rossberg vs. State, 111 Md. 396, which expressly decides that either of said things may be done and an Ordinance remain valid.

In the case of Barnie, decided in Frederick County, Md., Circuit Court, to which reference was made in the brief of the petitioner, Judge McSherry, as he always did whatever he considered, ably discussed the game of baseball as work or occupation, and said that it is no less bodily labor because offering recreation to those who pay to witness it," etc., but he was dealing with players who were paid a salary and who played a game to witness which an admission fee was charged. There are many instances that might be suggested of a person using the ordinary implements of his daily work for Sunday pleasure. Surely because a man drove a horse hitched to a wagon for a living he would not be punished for taking the same horse and wagon or a pleasure trip on Sunday. It would hardly need citation to show that the Mayor and City Council could not pass an Ordinance directly contravening the State law. There might be some doubt in this regard in this case, so that while this much has been said, largely, however, upon the theory that the Ordinance of 1918 and the resolution of the Park Board is not in derogation of the State law, but an extension of the

penalties of the same, yet, even if this is not correct, the police power conferred upon the Mayor and City Council by the charter, to wit, by the Act of 1898, Chapter 123, Section 6, subsection 18, gives the Mayor and City Council power "to pass ordinances for preserving order * * * and insuring the good government of the City * * * to have and exercise * * * all the power commonly known as the police power to the same extent as the State has or could exercise within said limits of said city."

This grant of power is clearly conferred by the Legislature and the right is given to legislate by Ordinance on any subject that falls within the terms of the grant. If the Ordinance of 1827 was properly enacted and the Hiller case already cited has decided that it was within the proper exercise of the power to enact it, then the same power to pass would give the power to change that ordinance.

The Court in the same case says that a Sunday baseball ordinance is referable to the police power and is free from constitutional objections. If the people of Baltimore are in favor of the repeal of the ordinance or its amendment so as to permit the playing of baseball on Sunday they must apply to the proper legislative authority and not to the Courts. The authority that gave the power to pass the Ordinance would seem to have given the power to take it away. That is what they have done. The propriety of the exercise rests exclusively with the proper corporate authorities. State vs. Mott, 61 Md. 297; United Rwys. & Elec. Co. vs. State Roads Com., 123 Md. 588; Rossberg vs. State, 111 Md. 399.

Certain it is that ordinances not inconsistent with the laws of the State if falling within the grant of power conferred by the State upon a municipal corporation, can be enacted and all ordinances falling within the scope of the power for any City purpose may be passed.

It is now generally held that laws and ordinances of this character are passed in the exercise of the police power and it must be admitted that the State and City have the power to pass all proper laws and regulations of this nature." Case of Hiller, supra.

Without discussing the other questions presented I have concluded that the plaintiffs have a right as individuals to institute proceedings.

That the games sought to be stopped do not clearly fall within the description of gaming, fishing, fowling or hunting.

That the ordinance of May 25, 1918, is a valid exercise of the police power granted to the Mayor and City Council of Baltimore.

That the passage of the resolution mentioned in this case by the Park Board was in pursuance of the powers conferred upon it by Article 4 of the Public Local Laws of Maryland.

That the defendant is entitled to have the questions of fact submitted to a jury under Article 60, section 7, volume 2 of the Code, which provides that in mandamus proceedings "such issue shall be tried by a jury if either party desire it."

In conclusion it might be said that whatever tends to the proper observance of the day set apart for rest and holy keeping should meet with our most cordial approval, but we must bear in mind always that however much it may not so seem at the time, that in upholding the law we should believe that the voice of the people is the voice of God, and that when that voice is expressed it should be upheld if possible, so to do without infringing upon any constitutional right as guaranteed to every citizen of the Commonwealth.

The demurrer will be overruled.