LAROQUE et al. *v.* BOARD OF COUNTY COMMISSIONERS OF PRINCE GEORGE'S COUNTY et al.

[No. 134, September Term, 1963.]

330

*Decided January 24, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRES-
COTT, MARBURY and SYBERT, JJ.

*W. Byron Sorrell,* with whom was *Darrow Glaser* on the
brief, for appellants.

*Russell W. Shipley,* with whom were *Robert B. Mathias,
Lionell M. Lockhart* and *Joseph S. Casula* on the brief, for the
appellee Board of County Commissioners of Prince George's
County.

*Harry L. Durity* for the remaining appellees, Aloysius Hall,
*et al.*

PRESCOTT, J., delivered the opinion of the Court.

After the trial court denied appellants' petition for a writ
of mandamus to require the Board of County Commissioners

to issue them a permit to operate an automobile and motorcycle raceway for drag racing, they appealed.

The parties agree upon the following facts:

Appellants, owners of a 30 acre tract of land located approximately one-half mile south of U. S. Route No. 301 in the vicinity of Cheltenham, sought to use their property for the purpose of an automobile and motorcycle raceway for drag racing and made application in proper form accompanied by the required fee to the Board of County Commissioners (Board) on February 27, 1963, for a permit to operate same pursuant to Section 1069 of the Code of P. L. L. of Prince George's County (the Section is set forth below).

A hearing on this application was held on March 19, 1963, before the Board. At this hearing, appellants established by uncontroverted evidence that the entrance to the raceway would be more than 500 yards from the nearest church building and the race track itself at its closest point would be more than 1000 yards from the nearest church building. Objections to granting the permit by property owners in the area and other interested parties, which will be set forth in more detail below, were heard by the Board. At the conclusion of the hearing, it refused to issue a permit to operate the proposed raceway.

On May 9, 1963, the appellants filed a petition for a writ of mandamus to compel the issuance of the permit, to which the appellee, Board, filed a demurrer. Thereafter, appellees, Aloysius Hall, *et al,* filed a motion to intervene alleging that they were residents and property owners in the vicinity of the proposed raceway and would be affected by the proceedings.

The Circuit Court, after a full hearing, held that mandamus was the proper procedure in the case; that Section 1069 was constitutional; and that, under its provisions and those of 464 (b) (pertinent portions of which are also set forth below) the Board had authority to deny the permit, and its action in so doing was not arbitrary nor capricious.

In addition to the facts agreed upon here, there was additional testimony taken, relevant portions of which will be stated in considering Question No. II.

The appellants subdivide their argument under several head-

ings, but they may be determined by answering two questions: (1) Is Section 1069, or any of the portions set forth below of Section 464 (b)[1] unconstitutional as violating the Fourteenth Amendment to the United States Constitution or Article 23 of our Declaration of Rights; and (2) Was the action of the Board in denying appellants application reasonably necessary

---

1. Section 1069, Code of P. L. L. of Prince George's County (Everstine 1953) provides:

"1069. No person, organization, association, corporation, partnership or group of individuals shall conduct a baseball game, football game, motorcycle race or automobile race, to which the public is invited or admitted with or without charge for such admission, operated for private gain, without first obtaining from the County Commissioners of Prince George's County a written permit therefor, the fee to be one dollar ($1.00) for each permit issued for any one time, which fee shall be used for the purpose of defraying the cost incurred, any excess to go into general county fund." It further provides that no such license shall be issued for any place nearer than 500 yards from any church, and for penalties for violating the provisions of the section.

Section 464 (b) states: "The Board * * * shall have all the power and authority now or hereafter granted to it by law, and in addition, may, by resolution, ordinance or other appropriate action:

* * *

"21. Provide for inspection and require notice of public hearing before issuance of any license, permit or other letters of authority * * *.

* * *

"25. Provide for the regulation and control of all public amusements. To designate the kinds and types of amusements that shall be permitted in Prince George's County. To require public hearings and inspection of locations before issuing any permit and fix all charges and fees connected with the issuance of such permits. Public amusements shall include but not be limited to meets, contests [naming numerous other amusements], motorcycle and automobile events and exhibitions * * *.

* * *

"33. Enact any other ordinance for the safeguard of life, health and property and for the promotion of public safety, and moral welfare."

for the protection of the public welfare, etc., impartial in nature and not arbitrary or capricious in a legal sense?

I

The general rule, subject to exceptions, is that the Legislature of this State exercises the law-making power thereof and it cannot delegate such power. *Pressman v. Barnes,* 209 Md. 544, 121 A. 2d 816; *Md. Co-op. Milk Producers v. Miller,* 170 Md. 81, 182 A. 2d 432. However, one of the exceptions to that general rule is that the police power of the State may be delegated to the municipalities thereof. *Bladensburg v. Berg,* 216 Md. 292, 139 A. 2d 703; *Pocomoke City v. Oil Co.,* 162 Md. 368, 376, 159 A. 902; *Cox v. Anne Arundel County,* 181 Md. 428, 31 A. 2d 179. Compare *United R. & E. Co. v. State Roads Com.,* 123 Md. 561, 586, 91 A. 552, dealing with Section 6 (24) of the Baltimore City charter, which grants to the Mayor & City Council "all the power commonly known as the Police Power * * *." And when this power is lawfully delegated, the purely administrative duties incident thereto may in turn be again delegated to others (and this is true even though these latter delegated powers involve the exercise of a certain amount of discretion, not involved herein, *Pressman v. Barnes, supra*) or directly exercised by the first delegate, itself. *Pocomoke City v. Oil Co., supra; Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346; *Engle v. City Comrs. of Cambridge,* 180 Md. 82, 22 A. 2d 922.

The appellants seem to concede the above, but argue that any such delegation of the police power must be restricted by reasonable guides and standards as to the exercise thereof, when it denies a property owner a lawful use of his property. In this contention, they rely most heavily upon *Baltimore v. Radecke,* 49 Md. 217, *County Comm'rs v. Northwest Cemetery Co., Inc.,* 160 Md. 653, 154 A. 452, and *State v. Greenberg,* 221 Md. 471, 157 A. 2d 420. These cases are readily distinguishable from the case at bar, and no extensive elaboration is needed to establish this fact.

In *Radecke,* a Baltimore City ordinance, dealing with the erection and building of a steam machinery, provided that all permits issued for steam boilers and steam engines could be

*revoked* by the Mayor, alone. This Court noted that the ordinance committed "to the unrestrained will of a single public officer the power to notify every person who now employs a steam engine * * * to cease to do so," and held that it, therefore, did not fall "within the *domain of law*." In the *Northwest Cemetery* case, an act of the Legislature, which made it unlawful to establish or maintain a graveyard anywhere in Prince George's County without the written permission of the County Commissioners, was held to be invalid. The invalidity of the act was based upon the fact that it was not confined "to localities where it might have a clearly intended relation to the protection of the public health or other legitimate purpose of the police power," the Court specifically noting, "there is no suggestion in the bill of complaint [a demurrer to which had been sustained] that the cemetery of the appellee is objectionable from the standpoint of any public interest." Judge Urner wrote the opinion in this case and also that in *Gordon v. Montgomery County,* 164 Md. 210, 164 A. 676. In the latter, he upheld a statute regulating cemeteries under proper provisions relating to the police power, and distinguished *Radecke* and *Northwest Cemetery.* We will point out below that the instant case deals specifically with an exercise of the police power. Likewise in *Greenberg,* a statute was held to be invalid because the "authority delegated to the county commissioners * * * [was] not limited to matters falling within the scope of the police power, and [was] unreasonably broad in scope and effect."

An examination of the two statutes here involved reveals that they deal with the same subject matters (public amusements); hence, they should be considered together. We have held that the regulation or restraint of such amusements is "squarely within the ambit of the police power." *Gonzales v. Ghinger,* 218 Md. 132, 135, 145 A. 2d 769, wherein a number of authorities are cited to support the statement. We think a reading of the statutes, as quoted above, leaves no doubt that the Legislature intended to grant, and did grant, to the Board, a portion of the police power of the State. And in making a delegation of police power to a municipality, it is not necessary that the Legislature fix guides and standards for its exercise by the municipality; however, this Court, in its deci-

sions, has stated the test by which the validity, *vel non,* of the actions of the municipality, acting under such delegation, must be determined, which will be stated below. We hold, therefore, that Sections 1069 and all of the quoted provisions of Section 464 (b), with the exception noted below,[2] are proper delegations by the Legislature of the police power of the State, and they do not violate either the Federal or the Maryland Constitution. *Bladensburg v. Berg; Cox v. Anne Arundel County; Benner v. Tribbitt; Pocomoke City v. Oil Co.,* all *supra.*

## II

In *Pocomoke City, supra,* this Court, after a careful and thorough discussion and analysis of previous cases, stated that the following principles may be accepted as settled: "(1) That restrictions imposed by the State or some agency of the State upon the use of private property cannot be justified under the police power unless they are reasonably necessary for the adequate protection of the public welfare, safety, health, comfort, or morals [we held above that public amusements came squarely within the scope of the police power] ; (2) that whether such restrictions are reasonable in fact is a judicial question; (3) that when imposed by competent legislative authority the burden of proof in any such inquiry is upon him who challenges their validity [citations] ; and (4), when they are reasonably necessary for the adequate protection of the public welfare, safety, health, morals, or comfort, such restrictions will be regarded as a valid exercise of the police power unless they contravene some express constitutional prohibition." This language was quoted with approval in *Benner v. Tribbitt, supra,* and followed in several other cases. And to the above may be added that, when a municipality acts directly under a lawful delegation of police power, as described above, it must exercise such power impartially and not arbitrarily or capriciously in a legal sense (*Pocomoke City v. Oil Co.; Engle v. City Comrs. of Cambridge; Benner v. Tribbitt;* all *supra*), but it is not necessary

2. We do not find it necessary, at this time, to pass upon the constitutionality of the sentence in Section 25, which authorizes the Board "To designate the kinds and types of amusements that shall be permitted in Prince George's County."

that the municipality first enact an ordinance pursuant to the statute granting it police power before it may proceed in cases where a permit is required. *Engle v. City Comrs. of Cambridge, supra,* and cases therein cited.

From what we have said above (including what we said under I), the remaining question for our determination is the one we stated as question No. II.

There is no direct statement in the record as to how "drag racing" is conducted. It seems, however, that the participants operate automobiles and motorcycles with "hopped up" engines, which permit the vehicles to proceed at a high rate of acceleration. From a standing start, the operator of a vehicle, which travels a prescribed distance in the shortest period of time (usually measured by an electric timer), wins the race. Cf. Wentworth & Flexner, *Dictionary of American Slang.*

There was testimony before the Board to the following effect. The subject property is located some one-half mile from Route 301, a heavily traveled, through highway, with a maximum speed limit of sixty miles per hour. From Route 301, there is a thirty-two foot road to the proposed raceway, which crosses a railroad track before reaching it. The owners, if granted a permit, anticipated the construction of a grandstand to seat 10,000 spectators. The usual crowds attracted by this class of public amusement are not of the most desirable character. It was shown that three State Policemen are required to control the traffic at the Marlboro raceway, and witnesses stated that traffic congestion problems, if a permit were granted, would be serious, especially on Sundays. A police report was introduced stating that a canvass showed opposition by a "large majority of the people." A State Police sergeant, who made a study of the application, expressed opposition on the grounds that it would create "a greater problem than we already have on 301," and it would also create a problem "of the people on the drag strip itself—* * * it goes into the stands and encourages even spectators to violate the law." An article by the National Association of Police, which strenuously opposed drag strips and indicated they "serve no popular demands," was also introduced. Trains do not travel frequently upon the railroad

track mentioned above, but there was testimony that someone would have to watch it.

In addition, Boys' Village, a State agency operated on property located on the connecting road, also opposed the granting of the permit on the ground that its some 361 delinquent boys (chiefly 13 and 14 year old youths), who were on the "honor system" would be tempted to go astray with an amusement of the proposed nature so close by. And the Department of Game and Inland Fish, which anticipated obtaining property on both sides of the connecting road, likewise expressed opposition, on the ground that the additional traffic thereon would be detrimental to the successful conduct of its operations in that locality.

The testimony further disclosed that a well-known and well-attended drag strip was already operating in Prince George's County, about fifteen miles from the subject property.

With this testimony before the Board, we are unable to conclude that its action in denying the permit was not reasonably necessary for the protection of the public welfare, safety and morals, that it was partial in nature, or that it was arbitrary or capricious. We have found it unnecessary to set forth the proponents' testimony in detail. It consisted, principally, of the statements of one of the owners and a garage operator (who "hopped up" engines for drag racing) to the effect that the proposed operation would keep youngsters from drag racing on the public highways, and a petition of 137 names, not included in the record extract. Suffice it to say, it fell short of so far outweighing the testimony of the opponents, as to make the Board's action arbitrary or capricious.

We also find it unnecessary to rule upon appellees' contention that mandamus was improper in a proceeding of this nature. For the purposes of the case, we have assumed, without deciding, that mandamus was proper.

*Order affirmed, with costs.*