GINO'S OF MARYLAND, INC., ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

[No. 64 Adv., September Term, 1968.]

622

*Decided July 18, 1968.*

*Motion for rehearing filed August 9, 1968; denied September 9, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Arthur W. Machen, Jr.,* and *Alan D. Yarbro,* with whom were *Robert R. Bair* and *Venable, Baetjer & Howard* on the brief, for appellants.

*John D. Alexander, Jr.,* with whom were *Clayton W. Daneker* and *Constable, Alexander & Daneker* on the brief for appellees, J. Edward Muhlbach, et al.

624

*Edward J. Gutman, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor* and *Simon Schonfield, Assistant City Solicitor,* on the brief, for appellees, the Mayor and City Council of Baltimore, et al.

BARNES, J., delivered the opinion of the Court.

This appeal involves a test case filed on November 24, 1967, by Gino's of Maryland, Inc. (Gino's) and A-G Foods, Inc. (A-G), both Maryland corporations, in the Circuit Court of Baltimore City against the Mayor and City Council of Baltimore (City), the Building Inspection Engineer and the Zoning Enforcement Officer of the City, for declaratory (and injunctive) relief to determine the constitutionality and construction of Ordinance No. 938 of the City, approved July 28, 1961 (Ordinance 938), now codified as Article 30, §§ 41(6) and 42 of the Baltimore City Code (1966 Ed.). These sections require a special ordinance of the City Council of Baltimore City for any eating establishment in a First Commercial Use District which provides its own off-street parking and "where food and/or drinks are consumed in automobiles while they are standing on the lot." The property directly involved is 2912-18 Harford Road (the property) leased by Gino's. A-G owns all of the outstanding capital stock of Gino's and has guaranteed the obligation of the lease with respect to the property. J. Edward Muhlbach, Neil Cashen, Violet Yount, Margaret E. Gyr, Carl W. Mueller, Clay G. Thompson, K. Lee Peace and Margaret Mortimer, owners of homes in the neighborhood of the property, were permitted on January 5, 1968, by the Chancellor (Cullen, J.) to intervene as parties defendants. The appeal was timely taken from a decree, dated April 22, 1968, in which the Chancellor declared that Ordinance 938 was constitutional, that the permit issued on September 30, 1965, relating to the property was properly issued, that the use of the property is restricted as provided in Ordinance 938, that the injunctive relief to the plaintiffs was denied and that the plaintiffs pay the costs.

When the suit was instituted, A-G operated a chain of 85 restaurants and fried chicken carry-out stores in four states—

Maryland, Delaware, Pennsylvania and New Jersey. Twelve of them were located in Baltimore City. At the time of trial, which began on January 15, 1968, A-G had acquired another chain of 16 outlets and expanded the territory into the District of Columbia and Virginia. Most of the outlets in Maryland are operated by Gino's, a wholly owned subsidiary of A-G.

A-G, the parent company, was incorporated in 1959, consolidating four original Ameche stores previously formed by Alan Ameche and four Gino stores formed by Gino Marchetti while each was active in professional football as players for the Baltimore Colts.

Prior to the consolidation in 1959 and for some time thereafter, all of the A-G outlets consisted of operations which contemplated a substantial amount of eating in cars. In the operation of the Ameche stores, curb service was provided directly to customers seated in motor vehicles. The customers were served by "car hops," who received orders inside the building from each parking stall by means of an electronic communications system called telotrays and delivered the food and soft drinks ordered to patrons in their cars. There was a limited amount of interior seating provided for patrons. The Gino stores were outdoor quick-service food shops, with no interior seating. Over-the-counter outside service to customers was provided and the customers either had to eat in their cars, eat while standing in the open on the lot or carry the food off the premises. The testimony indicates that the original cost of the Gino establishment, exclusive of the value of the land, was between $55,000 and $60,000.

During the latter part of 1963 and the early part of 1964, A-G decided to change its method of operation of its stores. A review of its business indicated that it suffered in its earnings from the seasonal characteristics of the outdoor type of operation in the winter or when the weather was inclement. After studying the operations of a similar chain in the Midwest, A-G began to convert all Ameche and Gino units into all-weather air conditioned and heated establishments with interior seating for approximately 72 people. All new units built after March, 1965, in the four-state area have been built in accordance with this plan. The cost of a new Gino's store, fully

equipped, but exclusive of the value of the land, is approximately between $140,000 to $150,000.

After the change in the policy of operation, A-G no longer had curb-service drive-ins except for the establishments in the Washington, D. C. metropolitan area, recently acquired. There were no longer any of the old Gino units with outdoor self-service, except one located in Baltimore City at North Avenue and St. Paul Street and two in Pennsylvania. These three units have not been renovated because their respective lots are not large enough to accommodate the new type of building. The testimony indicated that the total cost of the renovation program in the four-state area was approximately $1,500,000. The new policy of A-G proved to be successful. The month of January, 1966, was the first January in the Company's history in which it "broke-even;" prior to that time the Company had always experienced a loss during that month.

Considering the property involved in the present case, the testimony indicated that it was the first of the new outlets constructed in accordance with the new policy. It was not an "old" outlet which was renovated. The building permit was issued by the City on September 30, 1965, and the completed structure opened for business on April 16, 1966. The building is of masonry construction. It is equipped with air-conditioning and heating and contains three washrooms, one for male customers, one for female customers and the third for the employees. Inside the building there is a counter, eighteen feet long, with three cash register positions so that six people can wait on customers. There are six tables across the front which have individual seats for eight persons and there are three tables on each side of the service area which have individual seats for four customers, a total of 72 seats. This number of seats is in accord with the general policy of the company in its various outlets, which vary in number of seats from 72 to 75. The tables, although portable, are made of heavy iron covered with formica. The seats are round, with no back, and are attached to the table by iron arms. The tables for eight are of a picnic type. In the newer units, the seats are red shell back seats. The floor of the building is of quarry tile. In the newer installations, wall-to-wall carpeting is used. No table cloths, forks, knives or spoons

are provided for the customers. There are no waiters or waitresses to serve customers at the tables.

In the surrounding lot there are spaces for the parking of 56 cars. There is a higher proportion of parking spaces to number of inside seats than in the usual operation at which the number of parking units is from 40 to 45 spaces. The property is larger than the usual one, and this fact accounts for the additional parking spaces.

In the building, food and beverages are sold consisting of hamburgers (20¢), cheeseburgers (25¢), french fries (15¢), fried chicken, milk shakes, coca-cola, coffee and hot chocolate. This menu is substantially similar to the menu of Gino's original drive-in operation and is identical with its present drive-in operation at the outlets where this operation is performed. The method of distribution is the same in all A-G outlets and is substantially the same as the method used prior to the establishment of the new policy. The hamburgers and cheeseburgers are wrapped in wax paper and placed in a small paper bag—white for hamburgers and yellow for cheeseburgers. If a tray is desired by the customers, a cardboard tray is provided with round indentations in it so that the paper cups containing the beverages can be inserted in the round slots (so that they will be held in place and not turn over), the hamburgers or cheeseburgers being placed in the center of the cardboard tray. If there is a take-out order, plastic round tops can be placed on the paper beverage cups to prevent spilling. Fried chicken is served in cardboard boxes, or if a take-out order is requested, in covered cardboard buckets. All food and beverages are delivered to the customers inside the building and there is no service provided for cars on the parking lot or otherwise outside the building. The operation on the property opens at 11:00 a.m. and closes at midnight, except on weekends when the operation sometimes continues until 1:00 a.m.

There are large metal containers on the parking area in which trash may be deposited. The parking area is brightly lighted.

The vice-president of Gino's, Robert Scrivener, in response to questions by the Chancellor, stated that the only real difference between the operation at the property and the operation

at Gino's drive-in type operation is that the customers are offered a heated and air-conditioned building in which to sit.

When the permit to erect the building on the property was issued on September 30, 1965, the Building Inspection Engineer, acting as the Zoning Commissioner, inserted in it the legend "No food to be served to be consumed in vehicles while parked on premises." Similar legends appear on all building permits for all old Gino establishments renovated or new ones constructed since 1961 in Baltimore City. Franklin W. Aschemeier, Jr., the Zoning Enforcement Officer, stated that "we use our discretion in the office as to what type of operation we think it is going to be", but was somewhat vague, in regard to what criteria, if any, were used in arriving at the decision to include the legend on the building permit. Mr. Aschemeier, however, testified that he would enforce Ordinance 938 regardless of whether the legend was present on the building permit. He testified further that his office acts on complaints of any violation of the Zoning Code and, after an inspection and report indicating that the complaint is justified, a violation notice then issues. He had received no complaint in regard to any alleged violations of Ordinance 938 except for Harford Road Gino's.

Elwood William Swam, Gino's Real Estate Representative in the Baltimore area, was instructed by Gino's to observe violations of Ordinance 938 at locations other than those operated by Gino's. He did this and testified that he had observed violations at other locations, but the facts observed were not communicated to the City.

After complaints were made to the City in regard to alleged violations of Ordinance 938 in the operation of Harford Road Gino's, Inspector Cellucci of the Bureau of Building Inspection made an investigation on November 3, 1967, at noon time and observed three cars on the parking area in which people were seated while eating their food. A violation notice dated December 11, 1967, was then sent to Emanuel Hettleman, owner of the property and lessor to Gino's, advising him of the violation and stating:

"An inspection of the premises revealed eating in

vehicles on the premises. *Discontinue and control all eating and/or drinking in vehicles on Premises."*

There were two other inspections made in which violations were observed. Mr. Scrivener did not dispute the accuracy of the reports of these violations observed by Inspector Cellucci.

Vice President Scrivener admitted in his testimony that if one would go to the property around noon time (one of the busiest times), at dinner time or during the early evening, someone could be found eating in his car on the parking area. Gino's had posted signs on the property advising its customers not to eat in their cars, and after the violation notice, installed new and larger metal signs on its parking areas adjacent to its various premises, four of which were posted at the property. The text of the new signs was: "To our Patrons—Eating and Drinking in Cars Parked on this Lot is Prohibited by Law. DO NOT EAT IN YOUR CAR. We invite you to enjoy your food in our planned, climate controlled dining area."

Although Gino's does employ private policemen to aid in maintaining order and minimizing traffic problems at the property, they were not instructed to and did not attempt to enforce the restrictions on the signs because as stated by Vice President Scrivener:

"* * * [W]hen you ask members of the public to come on your premises and invite them there, that eating in their automobiles is not, in itself, dangerous or injurious to health. It seems unreasonable to us to use strong-armed methods to enforce this regulation, which is not in itself a problem."

There was testimony by the intervening neighboring property owners which established that between October 14, 1967, and January 16, 1968 (during part of the time the weather was cold and inclement), there were 17 occasions on which a number of violations were observed from one person in a car to 21 persons eating food or consuming beverages. Some of the violations took place during the freezing weather. They testified that no attempt was made to stop the consumption of food in the cars in the parking area even though it was in plain view. One

property owner testified that he observed one arrest by the public police at the property and on one occasion the occupants of a car drinking from a glass bottle containing an amber fluid. The property owners testified to noisy and high speed operation of hot rod automobiles at all hours, including late at night. The premises are littered with food wrappers and the 15 large trash cans on the parking area sometimes overflow with trash and the debris lies on the parking area. Sometimes Gino's customers at the property do not use the trash cans, but litter the ground and on occasions, upon leaving the parking area, throw refuse from their automobiles onto the public streets and nearby private property in substantial amounts.

The Chancellor filed a well-considered written opinion in which he indicated that Ordinance 938 was constitutional, that the building permit for the property was properly issued and that the property was restricted as provided in Ordinance 938. In accordance with his opinion, the Chancellor passed the decree of April 22, 1968, the terms of which we have already indicated.

The appellants, A-G and Gino's, contend on this appeal that Ordinance 938 is unconstitutional and invalid for a number of reasons, that they have been injured by the capricious application of Ordinance 938 by the City, that, as properly construed, Ordinance 938 is not applicable to the business operated by them and, finally, that the Chancellor erred in various rulings on the evidence. We will consider these contentions in the order mentioned.

Before considering the contentions in regard to the constitutionality and validity of Ordinance 938, it will be well to review the statutes involved.

The General Assembly of Maryland by Chapter 705 of the Laws of 1927, codified as Code (1957), Article 66B, granted the City, and the legislative bodies of other cities and incorporated towns in the State with more than 10,000 inhabitants, the zoning power "for the purpose of promoting the health, security, general welfare and morals of the community." This Court has held that the City derives its zoning powers from Article 66B and not from its charter. *Baylis v. Mayor and City Council of Baltimore,* 219 Md. 164, 148 A. 2d 429 (1959);

*Scrivner v. Mayor and City Council of Baltimore,* 191 **Md.** 165, 60 A. 2d 190 (1948). Article 66B vests in the City the full power which the State can exercise within the proper limits and scope of the police power. *Carney v. City of Baltimore,* 201 Md. 130, 93 A. 2d 74 (1952).

Pursuant to this grant of power from the State, the City passed its comprehensive Zoning Ordinance which, as amended, is now codified as Article 30 of the Baltimore City Code (1966 Ed.), and references will be made to the sections of Article 30 of that Code. The declared purpose set out in Section 1 was as follows:

> "For the purpose of promoting the health, security, morals and general welfare of the community, the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards and other open spaces, the density of population and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes are regulated and restricted as hereinafter provided."

The City is divided into six use districts: Industrial, Second Commercial, First Commercial, Restricted First Commercial, Residential and Office and Residential. These use districts were established for the purpose set out in Section 1 and the criteria for their establishment are stated to be those purposes and also

> "the design, size and/or location of—
> (a) sanitary and storm water sewers;
> (b) water mains and pipes for fire extinguishment, domestic consumption and manufacturing;
> (c) other mains, pipes, conduits, sub-ways and underground structures;
> (d) high pressure water service for fire extinguishment;
> (e) fire houses and their equipment;
> (f) police stations with the number of patrolmen and the extent of their posts;
> (g) streets, alleys, bridges and paving;

(h) schools, parks, playgrounds and other public facilities and requirements; and considering among other things;

(i) traffic problems;

(j) transportation requirements and facilities;

(k) hazards from fire and disease;

(l) the height and area districts and regulations established by this ordinance;

(m) access of light and air to buildings;

(n) access for fire and police protection;

(o) protection of occupants of buildings from noise, dust and gases caused by traffic as affected by the use districts hereinafter mentioned, the use of land and buildings is hereby regulated and restricted, and the City of Baltimore is divided into six classes of use district, * * *."

In the First Commercial Use District, in which the property involved in the present case is located, the use of land for stores and shops generally is not prohibited nor is the use of land for a "restaurant and lunch room, neither with live entertainment."

It should be pointed out that Section 4 provides that 38 specifically named different lawful, but offensive or dangerous uses, are prohibited in an Industrial Use District "unless by authority of an ordinance." By Section 10, in regard to prohibited uses, from the Residential and Office Use District, it is provided in Item (27):

"Stadium or playfield with a permanent structure or with seats for more than five hundred persons, including any parking facilities for the general public, whether to be part of a school operation or otherwise, unless the City Council by Ordinance approves such use."

Section 20 in regard to parking areas provides that notwithstanding any provision of Article 30 the City:

"may provide by ordinance, upon such conditions as the Mayor and City Council shall determine, for the

"establishment maintenance and regulation of open areas in a Residential and Office Use District, or in a Residential Use District for the parking thereon of automobiles when to permit the parking of such automobiles would benefit the health, safety or general welfare of the community."

Section 20 then provides that upon the introduction of an ordinance to establish the parking areas, the ordinance shall be referred to the Board of Fire Commissioners, the Traffic Commission and the Planning Commission for investigation, recommendation and report as to the traffic hazards involved. There are also provisions for certain copies of a plat for reference to the agencies mentioned and for the posting of the premises.

Generally speaking, an application for a zoning permit is filed with the Building Inspection Engineer, as the Zoning Commissioner, and if disapproved, an appeal is taken to the Board of Municipal and Zoning Appeals (the Board), with a right of appeal to the Baltimore City Court and then to this Court.

Beginning with Section 41 there are provisions for *original jurisdiction* in which, in addition to the regulations and restrictions already set forth in the preceding sections, certain uses are further limited. Prior to the adoption of Ordinance 938 there were five such uses: (1) a public utility building excluded from a use district by prior provisions of Article 30; (2) a filling station, tanks or pumps for the sale of inflammable liquids in a use district where permitted; (3) a billboard for the display of outdoor advertising or poster boards in a use district where permitted; (4) the storing, killing and dressing of poultry in a use district where permitted; and, (5) an automobile washing establishment "where automobile-washing is the prime use of the lot" in a district where permitted.

These uses were permitted only after a public hearing before the Board and in compliance with the terms and conditions thereafter set forth. There were certain specific limitations as to location in regard to filling stations and billboards and other restrictions in regard to automobile washing establishments. Section 43 provides for the procedure in cases of original ju-

risdiction. It provides for a reference of the application by the Board to the Board of Fire Commissioners, the Commissioner of Health, and the Traffic Commission for investigation, recommendation and report as to the respective fire, health and traffic hazards involved. Guides and standards for the guidance of the Board in the exercise of its original jurisdiction are set forth in Section 44. These consist of 14 guides and standards related to various elements or factors to be considered in exercising the police power such as accessibility of the premises for fire and police protection, accessibility of light and air, protection of occupants of buildings from noise, dust and gases caused by traffic and the like.

It is in this statutory setting that the City enacted Ordinance 938. That Ordinance added a new subparagraph (6) to Section 41 which provides as follows:

"(6) An eating and/or drinking establishment on a lot, where such use is the prime use on the lot, in a First Commercial Use District where off-street parking facilities are provided for customers, and where food and/or drinks are consumed in automobiles while they are standing on the lot, may be permitted only after a public hearing before the City Council of Baltimore, and in compliance with the terms and conditions hereinafter set forth."

It also added Section 42 as follows:

"42. *Drinking and/or eating establishments.*

Notwithstanding any provision of this Article, the Mayor and City Council of Baltimore may provide by ordinance upon such conditions as the Mayor and City Council shall determine for the establishment, maintenance and regulation of eating and/or drinking establishments on a lot in a First Commercial Use District where off-street parking facilities are provided for customers and where food and/or drinks are consumed in automobiles while they are standing on the lot, when such establishments would benefit the health, safety or general welfare of the community.

No such ordinance shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least fifteen days' notice of the time and place of such hearing shall be published once a week for two weeks in a daily newspaper published in the City and the posting of a similar notice upon the area proposed to be used for such establishments.

Upon the introduction of an ordinance for such an establishment, as provided in this paragraph, it shall immediately be referred to—

(1) The Board of Fire Commissioners, for investigation, recommendation and report as to the fire hazards involved;

(2) The Department of Transit and Traffic, for investigation, recommendation and report as to the traffic hazards involved;

(3) The Planning Commission, for investigation, recommendation and report as to any future public use of the property involved and its relationship to traffic conditions.

(4) For the information of the agencies to which the ordinance is to be referred, there shall be attached four (4) copies of a plat, drawn to a scale of one inch to two hundred feet, showing the area to be used for such an establishment outlined in red.

(5) The premises shall be posted with a sign which shall not be less than four (4) feet long and three (3) feet high, with black lettering not less than two (2) inches high, on a white background. The sign must be placed in a conspicuous manner where it will be clearly visible and legible to the public."

As originally proposed in City Council Ordinance No. 1005 (which, as amended, became Ordinance 938), the new addition of subsection (6)—then subsection 5—to Section 41 (then Section 37), was as follows:

"5. A 'drive-in' restaurant or eating place at which the operators maintain an off-street area or parking

lot for the standing or parking of motor vehicles, and where food and drink or either of them are held for sale or may be served for human consumption within the motor vehicle."

The proposed ordinance was referred to both the Planning Commission and the Board for study and report. The Board recommended that this language be changed to read as follows:

"5. An eating and/or drinking establishment on a lot, where such use is the prime use on the lot, in a First Commercial Use District where off-street parking facilities are provided for customers, or where food and/or drinks are consumed in automobiles while they are standing on the lot."

The City Council ultimately amended the proposed ordinance as recommended by the Board and added the words "may be permitted only after a public hearing before the City Council of Baltimore, and in compliance with the terms and conditions hereinafter set forth." A new Section 37A (now Section 42) was also added by amendment, and the ordinance, as amended, was ultimately passed by the City Council and signed by the Mayor, becoming Ordinance 938.

### Constitutionality of Ordinance 938

In considering the constitutionality of Ordinance 938, we begin with the well-established doctrine of law that the ordinance is presumed to be constitutional and the burden is upon the person attacking its constitutionality, who must clearly show the unconstitutionality of the statute. As Judge (later Chief Judge) Henderson, for the Court, stated in *Pitts v. State Board of Examiners of Psychologists,* 222 Md. 224, 227, 160 A. 2d 200, 201 (1960):

"The adequacy of the legislative scheme is for the Legislature to determine, and there is a strong presumption in favor of constitutionality. Reasonable doubt in its favor is enough to sustain it. *Magruder v. Hall of Records Comm.,* 221 Md. 1, 6, 155 A. 2d 899."

See *Deems v. Western Maryland R. R. Co.,* 247 Md. 95, 231 A. 2d 514 (1967).

The appellants challenge the constitutionality of Ordinance 938 as denying them due process of law contrary to Article 23 of the Declaration of Rights of the Maryland Constitution and Amendment XIV of the Constitution of the United States, on two principal grounds: (a) the classification in the ordinance is arbitrary, unreasonable and capricious and (b) there is an invalid reservation of zoning power by the City Council. We will now consider these contentions.

(a)

As we said in *Eutaw Enterprises v. Baltimore City,* 241 Md. 686, 693, 217 A. 2d 348, 353 (1966), quoting with approval from *Allied American Mutual Fire Ins. Co. v. Commissioner,* 219 Md. 607, 623, 150 A. 2d 421, 431 (1959) :

> "If any state of facts reasonably can be conceived that would sustain a classification, the existence of that state of facts as a basis for the passage of the law must be assumed."

See *McGowan v. Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961).

The Ordinance as orginally drawn was submitted to both the Planning Commission and to the Board for study and report. The Planning Commission indicated its approval of the Ordinance as originally drawn. The Board was of the opinion that the coverage of the language of the Ordinance as originally drawn was unnecessarily inclusive and recommended amendment, adopted by the City Council, which restricted its application to any eating and/or drinking establishments on a lot, where the *prime use on the lot,* in a *First Commercial Use District,* where off-street parking facilities are provided for customers *or* where food and/or drinks are consumed in automobiles while they are standing on the lot. The City Council changed the word "or" to "and", thereby further restricting the application of the language of the ordinance.

It will be observed that Ordinance 938 does not *prohibit* an establishment as described in the ordinance from a First Commercial Use District. It requires that in order to use the land

for that purpose the approval by ordinance must be obtained, after a required public hearing and reference to three public agencies for study and report. The disturbance of neighboring property owners from noise, litter, and misconduct by persons on the parking area discloses a basis for the classification established by Ordinance 938 which we cannot say is arbitrary, unreasonable or capricious. See *Morris v. Postma,* 41 N. J. 354, 196 A. 2d 792 (1964).

The record indicates that Gino's was aware of the passage of the Ordinance, but did not seek to challenge its validity before it applied for its building permit. It accepted the building permit, verbally complained about the legend, and then proceeded to operate its business with little *real* effort to conform to its terms. One can understand Gino's reluctance, from an economic viewpoint, to instruct its private policemen to enforce its posted request to its customers not to eat or drink in their cars, but there would seem to be little doubt that the restriction *could be generally enforced* if the will to enforce it were present. Gino's has the choice of either enforcing the restriction or of receiving councilmanic approval by ordinance. We cannot say that this is an unreasonable alternative.

A case may arise in which the application of the ordinance might be discriminatory, or arbitrary, unreasonable or capricious in a legal sense so far as applied to a particular factual situation, but it is clear to us that the present case is not such a case.

It is also well established that the fact that some non-conforming business uses may be permitted to operate after the passage of a zoning ordinance does not establish that the ordinance is discriminatory. See *Eutaw Enterprises v. Baltimore City, supra* (241 Md. at 694).

(b)

The appellants earnestly contend that Ordinance 938 is unconstitutional and invalid because there are no proper guides and standards for the exercise of the power to grant or refuse approval by the City Council to the enterprise for which approval is sought, and urge upon us that our decision in *State v. Greenberg,* 221 Md. 471, 157 A. 2d 420 (1960), is controlling on this point. We do not agree. On the contrary, we are

of the opinion that our decision in *LaRoque v. Board of County Comm'rs of Prince George's County,* 233 Md. 329, 196 A. 2d 902 (1964), in which we distinguished *State v. Greenberg,* is controlling.

In *LaRoque,* an ordinance of the County Commissioners of Prince George's County was involved requiring approval by the County Commissioners for the operation or conducting of a motorcycle or automobile race, baseball game, or football game to which the public was invited and for which an admission charge was made. The appellant in that case was the owner of a 30 acre tract of land on U. S. Route 301 near Cheltenham who sought unsuccessfully the approval of the County Commissioners to use the property as an automobile and motorcycle raceway for drag racing. The appellant made the contention that there were no guides or standards for the guidance of the legislative body and a consequent denial of due process of law. This contention was rejected by the trial court and by this Court. After pointing out that the State may properly delegate the law-making power in connection with the police power to municipalities and that the restriction in question came "squarely within the ambit of the police power," Judge (later Chief Judge) Prescott stated for the Court:

> "The appellants * * * argue that any such delegation of the police power must be restricted by reasonable guides and standards as to the exercise thereof, when it denies a property owner a lawful use of his property. In this contention, they rely most heavily upon *Baltimore v. Radecke,* 49 Md. 217, *County Comm'rs v. Northwest Cemetery Co., Inc.,* 160 Md. 653, 154 A. 452, and *State v. Greenberg,* 221 Md. 471, 157 A. 2d 420. These cases are readily distinguishable from the case at bar, and no extensive elaboration is needed to establish this fact."

After distinguishing *Radecke* and *Northwest Cemetery Co., Inc.,* Judge Prescott stated:

> "Likewise in *Greenberg,* a statute was held to be invalid because the 'authority delegated to the county

commissioners * * * (was) not limited to matters fall-
ing within the scope of the police power, and (was)
unreasonably broad in scope and effect.' "

\* \* \*

"[I]n making a delegation of police power to a munic-
ipality, it is not necessary that the Legislature fix
guides and standards for its exercise by the munici-
pality; * * *."

Prior to transfer of the power to exercise original juris-
diction over gasoline filling stations to the Board, the City
Council reserved this power under Section 34 of the compre-
hensive zoning ordinance, Ordinance No. 1247, of the City, ap-
proved March 30, 1931. There were no guides or standards set
forth for the guidance of the City Council. Our predecessors
sustained this provision of the zoning ordinance in *Kramer v.
Baltimore,* 166 Md. 324, 171 A. 70 (1934). Judge Urner, for
the Court, stated:

"The considerations affecting the comprehensive solu-
tion of such a municipal problem are clearly appro-
priate for the exercise of the city's legislative judg-
ment." (166 Md. at 328.)

\* \* \*

"Upon principle and authority we decide that the
reservation in the Zoning Ordinance of authority to the
Mayor and City Council of Baltimore to determine as
to the issuance of permits for filling stations in non-
residential districts is a valid provision." (166 Md. at
332.)

The reason for our holding in *LaRoque* and that of our pre-
decessors in *Kramer* is apparent. When legislative power is
*delegated* to administrative officials it is constitutionally re-
quired that adequate guides and standards be established by the
delegating legislative body so that the administrative officials,
appointed by the executive and not elected by the people,
*will not legislate,* but will find and apply facts in a particular
case in accordance with the policy established by the legislative
body. It seems apparent that the legislative body which estab-

lishes guides and standards for the guidance of administrative officials does not need to establish guides and standards for itself, as it is presumed to exercise the police power in a constitutional, lawful and proper way. Most certainly, it cannot be presumed by the Courts that such will not be the character of the legislative action. If it should happen, however, that the legislative action is arbitrary, unreasonable and capricious and the person injured is able to meet the burden of establishing this, the courts will give relief against this unconstitutional denial of due process of law. In the present case, no application for councilmanic approval has been made by Gino's, and hence any issue of arbitrary, unreasonable or capricious action by the City Council is obviously not before us.

The City argues that, if guides and standards were required, there are sufficient guides and standards in Ordinance 938 and in other sections of the zoning ordinance to guide the City Council in exercising its legislative judgment. The City, in making this argument, relies on *McBriety v. Baltimore City,* 219 Md. 223, 148 A. 2d 408 (1959), *Pressman v. Barnes,* 209 Md. 544, 121 A. 2d 816 (1956), and *Tighe v. Osborne,* 150 Md. 452, 133 A. 465 (1926), and points out that the language "benefit the health, safety or general welfare of the community" set forth in Article 30, Section 20 (then Section 17) of the Baltimore City Code (set forth above in connection with the approval of parking areas) was before us in *Reus v. Baltimore,* 220 Md. 566, 155 A. 2d 513 (1959), although the issue of the validity of Section 20, *vel non,* was not raised in *Reus* or decided by us. We do not find it necessary to consider this argument by the City, as we follow the previous decisions of this Court in *LaRoque* and *Kramer* that guides and standards are not required for the guidance of the legislative body.

The appellants argue that there are no guides or standards to control the administrative officials charged with the enforcement of the Ordinance, as they cannot determine what use will be made by Gino's of its parking area. The short answer to this argument is that the Zoning Enforcement Officer is not charged with the duty to make such a preliminary determination. It is presumed that Gino's knows the law and will use its property in accordance with the requirements of the zoning

law. The presence of the restrictive legend on the building permit is, in itself, of no effect and the evidence is uncontradicted that the City would enforce a violation of Ordinance 938 regardless of the presence or absence of a restrictive legend on the permit. As the Chancellor aptly stated in his opinion :

> "The plaintiffs can hardly be heard to complain that the 'duly and regularly constituted authorities' voluntarily reminded them of the limited use to which the premises could be put."

The scope of the duty of the Zoning Enforcement Officer in enforcing Ordinance 938 appears in the Ordinance itself, i.e., that without prior approval by the City Council, no food or drink may be consumed in automobiles while they are standing on the parking lot of an eating establishment in a First Commercial Use District. When a complaint of an alleged violation is submitted to the Zoning Enforcement Officer, he has the complaint investigated and if the complaint is substantiated by the facts, appropriate action to abate the violation is then taken. The *only* complaint which had been received by the Zoning Enforcement Officer was in regard to Gino's. The evidence indicates that Gino's investigation shows that other violations have occurred at other establishments, but *no complaint has been made to the City*. If and when the Zoning Enforcement Officer might fail to investigate and act on valid complaints submitted to him, Gino's will not be without remedy.

### Applicability to Gino's of Ordinance 938 as properly construed

The appellants also contend that as properly construed, Ordinance 938 does not apply to Gino's operation. The thrust of their argument is that zoning ordinances are in derogation of the common law and should be strictly construed, and although its plain purpose and intent must be given liberal effect, the Ordinance should not be extended by implication to cases not clearly within the scope of that purpose and intent (citing *Landay v. Board of Zoning Appeals,* 173 Md. 460, 466, 196 A. 293 (1928) and *Heath v. Mayor and City Council of Baltimore,* 190 Md. 478, 484, 58 A. 2d 896 (1948) ; that the ordinance

should be construed so as to render it constitutional (citing *Higgins v. Mayor and City Council of Baltimore,* 206 Md. 89, 110 A. 2d 503 (1955) ) ; that the history of the legislation indicates that it was intended to apply to the old fashioned drive-in with outdoor service like the old Ameches and this construction alone can save the constitutionality of the Ordinance. We agree with the first two propositions, in regard to strict construction as being in derogation of the common law and if there is an ambiguity there should be a construction which would render the legislative action constitutional rather than unconstitutional, but we cannot agree with the last proposition. On the contrary, in our opinion, the history of the legislation indicates that the words "drive-in" were deliberately eliminated in the City Council by amendment and the broader words of the present Ordinance placed in the Ordinance. These words literally cover the operation by Gino's at the property, which indeed is essentially the same operation as that of the old drive-in arrangement except that the inside tables and seats are provided with protection from the elements and with heat in winter and air-conditioning in summer. The *opportunity* for 72 patrons to go inside is most certainly provided by Gino's, but the evidence in the present case clearly establishes that many patrons of Gino's do not choose to avail themselves of that opportunity but rather prefer to eat in their automobiles on the parking area. There are many possible reasons why this seemingly unusual choice is made ; i.e., the patrons may be curiously or insufficiently dressed to eat inside without embarrassment, the inside arrangements may seem crowded at the time, there may be the desire for the privacy of the automobile to the lack of privacy at the inside tables, the patrons may be allergic to air-conditioning, or any number of other reasons too numerous to mention. However this may be, the proof indicates that the *patrons* in substantial numbers and with some lack of consideration for the proper disposal of trash and of the neighboring property owners *do* eat in their automobiles in violation of the provisions of Ordinance 938, which, in our opinion, do apply and were intended to apply to an operation like the one conducted by Gino's at the property.

As we have already indicated, we are of the opinion that the

restrictions of Ordinance 938 *could* be enforced by Gino's. If it is unwise for business reasons to do this, the remedy is to obtain councilmanic approval for the operation or, perhaps, request the City Council to amend Ordinance 938 so that it will not apply to operations of the type involved in this case.

### Rulings on the Evidence

The appellants argue that the Chancellor was in error in permitting the property owners to testify in regard to litter mostly consisting of food bags bearing Gino's name which they found on their respective properties. In our opinion this testimony had some relevancy to a consideration of the extent of the violation, thereby tending to contradict the appellants' position that the alleged violations were trifling or *de minimis*. The evidence also pointed, to some degree, to one of the problems which the City Council was attempting to meet and regulate by the passage of Ordinance 938.

In any event, however, we can find no objections to the evidence and no motion to strike it out, so that the issue is not properly preserved for our consideration. Maryland Rules 522 and 885. *Tully v. Dasher,* No. 257, September Term, 1967, filed July 2, 1968; *Rose v. State,* 240 Md. 65, 212 A. 2d 742 (1965).

*Decree affirmed, the costs to be paid*
*by the appellants.*